124 F.3d 204
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Charles M. MILLNER, Plaintiff-Appellant,
v.
ITT AEROSPACE/COMMUNICATIONS DIVISION OF ITT CORPORATION,
INCORPORATED, Defendant-Appellee.
 No. 95-3545.
 United States Court of Appeals, Seventh Circuit.
 Submitted Jan. 29, 1997*
Decdided July 21, 1997.
 
 1
 Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division.
 
 
 2
 Before Hon. THOMAS E. FAIRCHILD, Circuit Judge Hon. WILLIAM J. BAUER, Circuit Judge Hon. JOHN L. COFFEY, Circuit Judge
 
 ORDER
 
 3
 Charles Millner brought a qui tam action under the False Claims Act ("FCA"), 31 U.S.C. §§ 2729-33, gainst ITT Aerospace/Communications Division of ITT Corporation ("ITT")--Millner's former employer. The United States elected not to take over the action, leaving Millner free to proceed. The court granted ITT's motion for summary judgment. Millner has appealed.
 
 Background
 
 4
 Since 1983, ITT has had contracts with the Army for the development and production of communications equipment for combat vehicles. The equipment involved in this case is called SINCGARS (Single Channel Ground Air Radio System). A unit consists of a radio and a mounting tray. The radio is attached to the top of the tray, and the bottom is to be attached to a vehicle. The tray consists of two metal plates separated by four rubber shock isolators (shock absorbers). Each shock isolator is held between the plates by a bolt which passes through the top plate, through the shock isolator, and through the bottom plate, held in place by a nut. This lawsuit involves the tray and the shock isolators.
 
 
 5
 The specifications initially required that SINCGARS units be subjected to so-called sine vibration testing. In 1986, the Army indicated its desire to change to a more rigorous test. It wanted to subject the units to random vibrations which must be endured for six or twelve hours, depending on the type of vehicle on which the unit would be mounted. Changing the test would require agreement by IT and the Army and a change in the contract.
 
 
 6
 In 1987, before agreeing to change the test, IT conducted its own tests according to the Army's proposed changes and found that the shock isolators in the mounting tray would deteriorate before the six or twelve hours had elapsed. Evidently the shock isolators could survive more than two hours of the random vibration because it was decided that "changing out" the mounting trays after two hours would avoid the problem and permit the other parts of the units to survive the full time. On November 20, 1987, ITT and the Army agreed on the change to random vibration testing except that shock isolators would be changed out after every two hours.
 
 
 7
 At the core of this lawsuit is an idea for modifying the mounting tray which has been called the Jam Nut Configuration. The idea was developed in the summer of 1987 by Dan Rippe and Millner, ITT employees who were testing the SINCGARS units. ITT points out that three Army personnel were present full time at ITT's plant and had unlimited access, but it has not produced any evidentiary material showing that any Army personnel became aware of the Jam Nut Configuration until August 15, 1989 when it was described in a study called a P31 Study. A critical part of Millner's theory is that ITT deliberately concealed its information about the Jam Nut Configuration from the Army, with a fraudulent purpose so that claims it presented were false or fraudulent.
 
 
 8
 On September 1, 1987, Mr. Rippe submitted a memorandum to other ITT employees describing "options" which had resulted in isolators surviving 36 hours of random vibration. One of the options was the Jam Nut Configuration. This "method would be to use a longer center bolt (new: 1/4-20 X 1.000) and jam nut combination. With this method loctite (grade A), would be applied only to the jam nut threads leaving the threads inside the pedestal section clean." It was said, "The life and repairability of the isolators can be maximized by a simple change in the assembly process." A cost estimate accompanied the memorandum. Both options were again addressed in a study by Mr. Rippe, dated November 20, 1987.
 
 
 9
 Douglass Doerr, Program Manager of SINCGARS for ITT explained in a supplemental affidavit that "because SINCGARS contract is a fixed price contract, ITT was unwilling to incorporate the jam nut configuration unless and until the configuration was adequately tested to determine the impact of the configuration on the system from the standpoint of both design and cost. Changing the configuration of the attachment of the shock isolators would have entailed a design change to the mounting tray that would have necessitated complete environmental and reliability (PRAT) testing, specifically focused on the effect of incorporating the jam nut configuration with respect to ballistic shock testing and vibration testing with respect to reliability." Although Millner argues that no further testing was necessary a portion of his deposition seems to concede that full testing had not occurred. When asked about ballistic testing he had performed on the Jam Nut configuration, he noted a possible problem. Then asked, "Would it be fair to say you never got that far in the testing?" he answered, "Correct."
 
 
 10
 Delivery of SINCGARS units began in January, 1988. An internal ITT memorandum, dated January 15, was entitled "B & P Hours: SINCGARS Mounting Tray Design. It recited
 
 
 11
 Because of problems associated with the corrosion of the mounting tray, as well as, the failure of shock isolators in vibration, an overall redesign of the mounting tray is in order. It is our opinion that the government will be very receptive to a complete new mounting tray design to eliminate the possibility of cleansing agent entrapment as well as providing for a new shock isolator as a result of their requirement imposing random vibration on the program.
 
 
 12
 The memo continued under headings of "Technical Description." "Schedule," and "Cost."
 
 
 13
 An internal ITT memo dated August 30, 1988 read as follows:
 
 
 14
 We have decided not to proceed with the redesign of the mounting tray at this time. After a thorough review by all functions, it did not offer the cost savings we had originally envisioed; and Purchasing now indicates they can successfully procure the current tray in the volume we require.
 
 
 15
 This will be one of the candidates for the P31 program as there is significant advantage to the Government in reducing the shock mount change out required with the current design in the field.
 
 
 16
 There is little doubt the proposed new design would be an improvement in producibility and should be incorporated if we can devise a cost-effective program.
 
 
 17
 The P3I SINCGARS FINAL STUDY REPORT was prepared for the Army by ITT. It was dated 15 September 1989. It addressed sixteen topics, No. 4 being Redesign of SINCGARS Mounting Tray. Report Number 4 was dated August 15, 1989. It covered a number of possible improvements, including alternative materials and others. The section entitled "Shock Isolator" reflected the alternative changes originally proposed by Rippe in September 1987. The Report recommended redesign of the tray.
 
 
 18
 On February 19, 1990, the Army wrote ITT identifying three improvements contained in the P31 study and requested an ECP (Engineering Change Proposal) for them. One of the three was the Jam Nut Configuration. According to Doerr's affidavit, a request for an ECP is the first step in producing cost estimate and ultimate contract modification.
 
 
 19
 On April 24, 1990, ITT employee Fabish wrote P.N. Clark asking that he advise the Contracting Officer that ITT "is not willing to proceed with an ECP for introduction of [the Jam Nut Configuration] into production on a fixed price basis until samples are produced and proven in tests.
 
 
 20
 On July 3, 1990, ITT sent the Army an estimate of $48,481 for time and material for a study which has been referred to as the Taguchi study. A report was issued June 30, 1991. It recommended redesigning the mounting tray to incorporate a stiffener rib and study of shock isolators to determine performance differences between vendors and minimum requirements for use with the stiffer tray. ITT employee Frank Fabish, testified that the government had decided not to order a redesign of the mounting tray or change in the isolators. His handwritten note to that effect is dated 2/10/92. No other documentation of the decision is in the record.
 
 
 21
 Before beginning this lawsuit Millner made two complaints to agencies of the Army. They were investigated and rejected.
 
 
 22
 In March 1992 the Army Criminal Investigation Command concluded:
 
 
 23
 Information was developed that although ITT Defense Corporation personnel pursued alternatives to lengthen the life expectancy of this part, no viable solution was found and the government did not consider this to be a problem warranting a change in design specifications.
 
 
 24
 In February 1993 the Defense Contract Mangement Command concluded:
 
 
 25
 CECOM did not consider this (the life expectancy of the mounting tray shock absorber] to be a problem of sufficient magnitude to warrant changing the design specifications. Instead, instructions were issued to units processing this component that the shock absorbers had to be replaced on a regular basis to prevent their failure.
 
 The Millner Claims
 
 26
 The relevant portion of the False Claims Act (31 U.S.C. § 3729) imposes liability for a civil penalty and treble damages on [a]ny person who ... knowingly presents, or causes to be presented to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval ..." Millner's complaint (with one exception) does not expressly identify particular claims for payment or approval presented by ITT, but liberal construction is appropriate. So construed we discern four possible claims.
 
 I.
 
 27
 That it knowingly presented claims for payment for SINCGARS units, delivered from 1988 to 1991, which were false in that ITT certified the units as meeting contract requirements. (Complaint, paragraph 14).
 
 
 28
 Summary judgment in favor of ITT was correct because the test requirement had been modified by agreement to permit the change out of the shock isolators after two hours, and the units passed the modified test. That was what the contract required.
 
 II.
 
 29
 That ITT knowingly presented claims for payment for an approval of ITT's making the Taguchi study, September 12, 1990 to June 30, 1991. The claims were allegedly false and fraudulent in that ITT had concealed, up to those dates, its knowledge of the Jam Nut Configuration. (Complaint, Paragraph 13).
 
 
 30
 Summary judgment in favor of TT was correct because on August 15, 1989 the P3I report had described the Jam Nut Configuration and in February 1990, well before the Taguchi study, the Army had requested an ECP for it. The idea had been fully disclosed to the Army before funds were sought or the study authorized.
 
 III.
 
 31
 That ITT knowingly presented claims for payment which were false because the units were defective and not capable of sustained performance under operational conditions. (Complaint, Paragraph 15).
 
 
 32
 Summary judgment in favor of ITT was correct because all units conformed to the contract, including the modified testing agreed to. Moreover ITT employee Robert Jones made an affidavit that he collects Army reports of problems with SINCGARS in the field and they showed no field failures of the mounting tray shock isolators.
 
 IV.
 
 33
 That ITT knowingly presented claims for payment for SINCGARS units which claims were false and fraudulent in that ITT concealed its ability to modify the mounting tray to meet government specifications and quality requirements and significantly increase the useful life of the units, while continuously maintaining the problem could not be solved. (Complaint, Paragraphs 12 and 18).
 
 
 34
 ITT had no right or duty to modify the mounting tray unilaterally. It might have disclosed the idea of the Jam Nut Configuration to the Army and opened negotiations for making the modification at an appropriate price. This claim would at the least require proof that ITT made representations to the Army which were false and fraudulent because of ITT's possession of the information in the 1987 Rippe memorandum and report. The record contains no evidence of such representations.
 
 
 35
 Millner argues a different claim, in substance that ITT defrauded the government "When it accepted money for a Government funded 'P3 I' Study report dated August 15, 1989, in which the information presented as being part of the 1989 'P3I' study, contained information that was gathered in an 1987 Engineering investigation." Mi!!ner Brief, p. 6. See also pp 24 and 25. Miliner's complaint did not contain that claim nor was it ever amended to include it. In any event, the "P3' Study dealt with sixteen topics, and the topic devoted to redesign of the tray dealt with a number of matters besides shock isolators. There is no evidence that the government was charged for work which merely duplicated work already performed in 1987 by Rippe and Millner. It does not appear that ITT had previously disclosed the Rippe report and memorandum, but the evidence as a whole would not support a jury finding that claims presented for payment for work on P3I were false or fraudulent to pro se
 
 
 36
 Notice To Pro Se Litigant of Procedure in Opposing a Motion for Summary Judgment.
 
 
 37
 Defendant's brief in support of its motion for summary judgment stated on page 6 that "To defeat a summary judgment motion, the non-moving party must be able to present the court with specific, admissible evidence to demonstrate that a genuine issue of material fact exists and requires trial." This circuit has a rule that pro se litigants are entitled to notice of the consequences of failing to respond to a summary judgment motion. Timms v. Frank 953 F.2d 281,285 (7th Cir.), cert denied. 504 U.S. 957 (1992). "[T]his notice should include both the text of Rule 56(e) and a short and plain statement in ordinary English that any factual assertion in the movant's affidavits will be taken as true by the district court unless the non-movant contradicts the movant with counter-affidavits or other documentary evidence." Id.
 
 
 38
 The sentence quoted from defendant's brief is insufficient and neither ITT nor the district court sent an appropriate notice. Millner had the assistance of appointed counsel from June 29, 1994 until counsel was permitted to withdraw March 20, 1995. Counsel appears to have assisted with discovery. Accordingly, Millner was appearing o se when the motion for summary judgment ws filled August 1, 1995. It is not reversible error, however, to fail to give a Timms notice when it appears beyond doubt that the o se party can prove no set of facts in support of his claim which would entitle him to relief Id. at 286.
 
 
 39
 Miliner filed voluminous responses to ITT's briet and to affidavits of ITT employees filed in support of its motion. He attached many ITT documents and portions of depositions, which would have been admissible at trial insofar as relevant, and it is evident that he relies almost entirely on documents to prove his case. In response to ITT's reply brief in support of its motion he noted ITT's argument that certain documents filed by him were not "notarized or signed under oath." He indicated he was unaware of that requirement and offered "that the contents contained in this document, and all the documents that I have personally submitted to the Court to include the initial filing dated January 10, 1994, will be sworn to upon the instruction from the Court." He indicates on appeal that the district court should have permitted him so to swear. His responses, however, are largely conclusory and argumentative in nature. Rule 56(b) requires that affidavits opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." In our search through these voluminous papers, we have found no assertions of material fact to which vfillner could have testified on personal knowledge, and to which he could have made affidavits fulfilling Rule 56, which would have raised a genuine issue with the facts supporting the motion for summary judgment. It would have been useless to permit him to swear to arguments and conclusions.
 
 
 40
 We hold that Miltier was not prejudiced by the failure to receive a Timms notice.
 
 
 41
 ITT'S Counterclaim.
 
 
 42
 The district court also granted judgment for ITT with respect to its counterclaim for reasonable attorney's fees and expenses incurred in defending the action.
 
 31 U.S.C. § 3730(d)(4) provides:
 
 43
 If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.
 
 As stated by Judge Lee:
 
 44
 In support of its assertion that Millner's only intent is to harass ITT, ITT has provided the court with a list of Millner's previous acts against ITT:
 
 
 45
 1. After his termination, lf11ner picketed ITT's property for over fifteen weeks bearing a sign that stated "Vietnam Veteran Fired From Army Contract. Thank You, ITT."
 
 
 46
 2. Millner conducted a defamatory letter-writing campaign directed at United States Senators and Representatives, the President of the United States, multiple branches of the armed services including numerous Generals, Admirals, and other ranking officers, and foreign heads of state.
 
 
 47
 3. On July 30, 1991, Mil!ner filed a baseless charge with the National Labor Relations Board alleging violation of the National Labor Relations Act.
 
 
 48
 4. On September 12, 1991, Millner filed a baseless charge with the Equal Employment Opportunity Commission alleging that he was the victim of reverse discrimination.
 
 
 49
 5. Finally, Millner filed the present action on January 10, 1994.
 
 
 50
 ITT also points out that Miler admitted several times in his deposition that he would continue to pursue ITT in any way he could.
 
 
 51
 Clearly, ITT has shown that since Millner's termination he has pursued a pattern of conduct calculated to harass ITT and cause it as much harm as possible. It is also clear that Millner's False Claim Act is frivolous, vexatious, and brought primarily for purposes of harassment. Therefore, this court will grant summary judgment in favor of ITT to the extent it is seeking attorney fees and expenses as permitted by § 3730(d)(4).
 
 
 52
 ITT sought summary judgment on its counterclaim, and supported its motion with evidentiary materials. nMilUner responded on the merits of the claim, but made no response with respect to the counterclaim. On appeal he argues that ITTn should not have prevailed on the merits, but has not addressed in any other way Judge Lee's conclusion as to the counterclaim.
 
 
 53
 He has waived review and we see no need to discuss this ruling.
 
 
 54
 The judgment appealed from is affirmed.
 
 
 
 *
 After an examination of the briefs and the record, we have concluded that oral argument is unnecessary in this case; accordingly, the appeal is submitted on the briefs and the record. See Fed. R.App. P. 34(a); Cir. R. 34(f)