**UNITED STATES ex rel. Patricia MIKES, Plaintiff,**

v.

**Marc J. STRAUS, Jeffrey M. Ambinder and Eliot J. Friedman, Defendants.**

**No. 92Civ.2754 (CM).**

United States District Court, S.D. New York.

June 2, 2000.

Harold R. Burke, Holland, Kaufmann & Bartels, Greenwich, Connecticut, Philip Dale Russell, Greenwich, Connecticut, for relator.

David J. Meiselman, Barry B. Cepelewicz, M.D., Meiselman, Farber, Packman & Eberz, Mount Kisco, New York, for defendants.

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

McMAHON, District Judge.

In this second act of a tawdry drama that has run far too long in this Court,

Drs. Marc. J. Straus, Jeffrey M. Ambinder and Eliot L. Friedman, as prevailing defendants in a qui tam proceeding, have applied to the Court for an award of attorneys' fees pursuant to 31 U.S.C. § 3730(d)(4).

After reviewing the evidence adduced during a two-day bench trial on this subject, I conclude, in an exercise of my discretion, that the application should be granted in part and denied in part.

## FINDINGS OF FACT

I will assume that the reader is familiar with the Court's opinion dismissing the underlying qui tam action. *See United States ex rel. Mikes v. Straus*, 84 F.Supp.2d 427 (1999). What follows is the story behind that story.

### (1) *Dr. Mikes's Employment at PCCA*

In the spring of 1991, Patricia Mikes, a board certified pulmonologist whose background lay primarily in academic medicine, began negotiating with Marc. J. Straus, an oncologist who, with two other physicians, ran a thriving, multi-location practice in Westchester County. Dr. Mikes had previously set up a pulmonology clinic at St. Vincent's Hospital, and she was eager to do the same in the more lucrative setting of a private practice. Drs. Straus, Ambinder and Friedman, who treated numerous patients with lung diseases (including lung cancer), were equally eager to have a colleague on staff who specialized in lung diseases, as that would increase the attractiveness of their practice. Dr. Mikes signed an employment contract with the defendants, operating under the name Pulmonary and Critical Care Associates ("PCCA"), on or about May 21, 1991.

During the negotiations over Dr. Mikes' employment contract, the parties had discussions about her desire to have the practice purchase about $40,000 of highly specialized pulmonary diagnostic and care equipment. I credit the testimony of Dr. Mikes that Plaintiff's Exhibit 44, a proposal for the development of a pulmonary clinic at Oxford Medical Group, P.C. (the name under which the defendants now practice), was prepared during the course of those negotiations. I also credit the testimony of Harold Burke, the lawyer who negotiated her employment contract, that Paragraph 10.F. of that contract, which provided for Dr. Mikes to pay liquidated damages to the partnership in the event she left her new job within three months, was included in the contract as a hedge against the possibility that Drs. Straus and his partners would expend substantial sums for equipment that they would be unable to use if Dr. Mikes left precipitously. I find Dr. Straus' testimony that the proposal was a recent fabrication, and that he never used the name Oxford Medical Group until a day or so before he incorporated his practice under that name, to be untrue.

Dr. Mikes joined the defendants' practice in mid-July 1991. As no one representing the defendants gave believable testimony about the equipment issue, I would be engaging in impermissible speculation by deciding which came first: Dr. Mikes' becoming testy as a result of her new employers' failure to go out and purchase the equipment she wanted, or defendants' quick realization that their new employee was not a very pleasant person to have around.

I could understand if the latter were the case, however, because I credit each and every bit of testimony I heard or read about her difficult personality. To put it bluntly, Dr. Mikes is not a very nice person. She comes across as someone who thinks herself quite superior to everyone else, in terms of both her intelligence and her ethics. Numerous staff members of the practice testified that she did not speak to them or interact with them, except to tell them that they did not know what they were doing. Dr. Carol Epstein, M.D., who was employed at Oxford at the same time as Dr. Mikes, testifying by affi-

davit,[1] described relator variously as "arrogant," "condescending to physicians, medical assistants and members of the staff," "an angry person," "confrontational," "hostile" and "derogatory." Norman Levine, who was employed by defendants as a medical assistant during Dr. Mikes's employment, averred that relator "made derogatory remarks about other physicians;" that relator once told him that all the physicians at St. Agnes Hospital were "stupid," "imbeciles," or "incompetent," and "incapable of practicing her quality of medicine;" and that patients complained to him that Dr. Mikes was "rude, abrupt, and cold." Having seen her on the stand, I believe every word of these characterizations.[2]

Dr. Mikes appears to have been oblivious of her co-workers. To cite but one astonishing example, Dr. Mikes claimed never to have met Norman Levine, the foreign medical school graduate who served as chief medical assistant in the practice. She testified that she didn't know who he was back in 1991, and she claimed not to recognize him when he came into court. This testimony is simply incredible. For all that it had multiple locations, Oxford Medical Group was not an overly large practice. It employed about a dozen professionals and paraprofessionals (5 or 6 doctors, 5 medical assistants, a technologist). It would have been impossible to work there and not to know one's co-workers, especially one who was identified by all three partners in the practice as the person who made the practice function. Either Dr. Mikes is lying when she says she never met Mr. Levine (which I believe to be the case) or she is pathologically unable to relate to other people (which may also be the case). In any event, it is clear that she made no effort to enter into a collegial relationship with her co-workers.

The results were predictable. No one liked her or wanted to work with her. Levine, the chief medical assistant, testified, credibly, that Dr. Mikes was problematic from the first day of her employment, and that he had difficulty persuading his colleagues to work with her—so much so that he made the medical assistant with the least seniority work with her most of the time.

Dr. Mikes' difficulties with others were not solely within the practice. In paragraph 3.B. of her employment contract, Dr. Mikes agreed that she would obtain consulting and admitting privileges at several area hospitals where her new colleagues routinely admitted their patients: St. Agnes, Putnam, Dobbs Ferry, White Plains and Peekskill. Paragraph 10.A.ii. of the contract made the failure to obtain and/or maintain privileges at any of those hospitals (except White Plains Hospital) grounds for the immediate termination of her employment, so it can be said that hospital privileges were of the essence of the agreement. However, it proved difficult to get Dr. Mikes admitting privileges at those hospitals, due to her irritating manner and superior attitudes. Drs. Straus and Ambinder testified, credibly, that they were required to run interference for their new colleague with credentialing committees at St. Agnes and Putnam Hospitals after she offended committee members during her interviews. Dr. Kenneth S. Schwartz, Director of Radiology at the Hudson Valley Hospital Center and a member of the credentialing committee at Peekskill Hospital, submitted an affidavit in which he averred, "I do recollect that Dr. Mikes' behavior during her interview was strange, not only because she was arro-

---

1. The parties agreed among themselves that most witnesses would be presented by affidavit, and waived cross-examination.

2. Dr. Mikes has changed jobs with great frequency over the past 15 years—at least once to become a "consultant" (a status this Court does not believe she assumed voluntarily). This factor supports my conclusion that Dr. Mikes had difficulty getting along with her colleagues.

gant and antagonistic, but primarily because it seemed as if she purposefully responded to the credentialing committee's questions in such a manner to ensure [sic] that the hospital would never grant her privileges." I credit that statement, as well as Dr. Straus' statement that Dr. Mikes did not obtain permanent privileges at Peekskill Hospital, in violation of her employment agreement (although she was accorded temporary privileges).

In the absence of any direct evidence, I decline to conclude definitively that Dr. Mikes' interpersonal difficulties played a role in her employers' reluctance to spend significant money for equipment that they would not need if she left the practice. Whatever the reason, having discussed the purchase of this equipment as part of their negotiations, Dr. Straus and his partners did not buy it. That decision had costly consequences.

**(2)** *The Spirometry Question*

To measure lung function in their pulmonary patients, the doctors at Oxford Medical Group used a device known as a spirometer. Although none of the witnesses could remember the name of the manufacturer of the spirometer that was in use during Dr. Mikes' tenure at the practice, the defendant produced an instruction manual and a maintenance manual for a Fukuda Model ST–90 spirometer, and the parties have litigated this action on the basis that the Fukuda machine was the spirometer in question. The Court so finds.

Norman Levine testified, and his employers confirmed, that he was the individual who selected the spirometer used in the practice. Levine testified, credibly, that he looked at five or six different spirometers before choosing the Fukuda. He selected it for several reasons, including its durability, portability (since it was moved among the several offices) and its efficiency. Most important was the fact that it came with a comprehensive service contract, pursuant to which the manufacturer would pick up the machine whenever the practice wanted it serviced and drop off a loaner. The manufacturer's representative recommended that the machine be sent in for service three times a year; Levine testified that he sent the machine in more often than that, including over all the Jewish holidays. Eventually, the practice had two of the machines in house, with one remaining at all times in the White Plains office. I find that Levine periodically sent the machines out for servicing, and that he did so at least three times a year as recommended by the manufacturer.

The parties marked the user's instruction and maintenance manuals as exhibits, and I have reviewed them. In pertinent part, they state that the machine is properly calibrated and, except for being checked periodically, needs no further adjustment. Thus, the Service Manual (PX–20) says, under the heading "Calibration:" "[n]o calibration is required since this machine is properly adjusted." Similarly, under the heading "Maintenance," it provides: "Since this instrument is properly adjusted at the time of production, no calibration is usually required unless the volume was changed by accident or the atmospheric pressure was changed." (*Id.*, Section 15–1). The Instruction Manual, which one might suppose a user would read, states, "No calibration is required except for periodical check." (PX–21, Instruction Manual for ST–90, at page 6). And the product information booklet, identifies a 3 liter calibration syringe as an "optional device." (*Id.*, page 2).

The same product information booklet announces that the ST–90 complies with the standards of the American Thoracic Society and all pertinent Federal regulatory agencies. (*Id.*, page 1). The booklet does not qualify that statement in any way, including by a statement that frequent, even daily, calibration is needed in order to bring the machine into compliance with those standards.

In short, a purchaser of the Fukuda ST–90 who reviewed the manufacturer's instruction manuals, and who sent his machine back to the manufacturer for "periodical checks" (i.e., servicing), would have every reason to believe that he had no need to calibrate his machine on a daily basis in order to obtain accurate results. Norman Levine testified that the manufacturer's representative never said a word to him about needing to buy a syringe or calibrate the machine on a regular basis, including when he placed a special call in order to find out whether the practice was not using the machine correctly. This testimony is consistent with the manufacturer's written representations, and I credit it.

Despite the manufacturer's assurances of reliability, the American Thoracic Society has promulgated recommended procedures for spirometry, which include a recommendation that a spirometer be calibrated daily with that "optional" 3 liter syringe. Dr. Mikes, as a Board certified pulmonologist, knew of the ATS recommendations, which had also been endorsed by Federal agencies like the Social Security Administration and National Center for Health Statistics.

At some point during her first two months at Oxford Medical Group, she learned that the machine was not being recalibrated in the office on a daily basis. Dr. Mikes claims to have convened a meeting of the medical assistants (who actually operated the spirometers) to discuss the procedure. She testified that she learned at this meeting that no one was performing the procedure properly (by which she meant that no one was calibrating the machine on a daily basis). Dr. Mikes claims to have been concerned about this development, as well as about what she viewed as the lack of proper training in spirometry for the medical assistants. She testified that she went to Dr. Straus to alert him of the need to upgrade office spirometry procedures, handing him an article that laid out the relevant ATS standards. Dr. Mikes testified that she recommended to Dr. Straus that the office cease conducting spirometry until the staff could be properly trained and a syringe purchased. According to Dr. Mikes, Dr. Straus rebuffed her with the statement, "Don't stick your nose into what doesn't concern you."

Neither Norman Levine nor Robin Doss Little, the former medical assistants [3] who testified at the hearing before me, would logically have attended the meeting about which Dr. Mikes testified. Neither of them had any recollection of such an event. And Dr. Straus, needless to say, remembers no such conversation. He recalls only that Dr. Mikes said something to him about spirometry, which led him to ask Norman Levine to get into the details. Levine testified, credibly, that Dr. Mikes never spoke to him about problems with in-office spirometries, although he tried to engage her in conversation several times. Both men vigorously deny that Dr. Mikes said anything about a syringe, or indicated that a $150 part could solve any problems they might be experiencing. Rather, Dr. Straus testified that Dr. Mikes refused to be specific when he asked her to specify what the problem was, and instead demanded, on two separate occasions, that the practice purchase the pulmonary function equipment that had been discussed during her contract negotiations. When Dr. Straus told her that he thought they should simply send patients who needed pulmonary function testing to a local hospital, she accused him of trying to sabotage her ability to make money.

I have no difficulty siding with the two disinterested witnesses who testified that Dr. Mikes' "meeting" with the medical assistants is a figment of her imagination. As for her conversation with Dr. Straus, I conclude that neither doctor's testimony

3. Doss Little was actually a technician who from time to time performed spirometry and other medical assistant's tasks.

about this conversation is completely accurate, but that there is an element of truth in each account. On the whole, Dr. Straus's version of events strikes me as more nearly what happened than does Dr. Mikes's. In fact, both Dr. Mikes' testimony about the spirometry issue and her admitted behavior during the fall of 1991 strain credulity. For one thing, Dr. Mikes does not strike me as someone who would stand for a rebuff to her professionalism on the order of, "Don't stick your nose in." Her self-proclaimed (from the witness stand) professional ethical sense would have precluded non-response. However, I can readily believe that a conversation between the two doctors about Dr. Mikes' professional preference for pulmonary function testing over spirometry turned into a confrontational encounter, in which Oxford's continuing failure to purchase the pulmonary function equipment led to harsh words by Dr. Straus (perhaps along the lines testified to by Dr. Mikes) and bitter feelings on Dr. Mikes' part.

My conclusion that plaintiff is inventing her version of the meeting is buttressed by Dr. Mikes' admitted behavior—or, I should say, lack of behavior—during the months that followed. Despite her concern that patients at Oxford Medical Group were receiving substandard care, Dr. Mikes testified that she did *nothing whatever* to protect either the patients from harm or the practice at which she was employed from possible liability for malpractice. According to Lillian Fojas, the assistant chief medical assistant who performed some spirometries for Dr. Mikes, plaintiff did not criticize or question the method used to perform the test. She did not offer any training to the medical assistants who were performing spirometries. She did not circulate the ATS standards to the other physicians in the office and suggest that they be discussed during a journal club (a sometime gathering of the physicians to discuss some issue of interest that was reported on in a medical journal). She did not even try to alert Drs. Ambinder or Friedman to this allegedly dangerous situation, for which they could have been held financially and professionally liable (Dr. Friedman was in charge of laboratory equipment and personnel, which makes her failure to approach him very strange indeed). She did not cover herself by sending a memo to Dr. Straus reminding him of her concerns, or even by making contemporaneous personal notes, as a prudent person of intelligence would have done. She did not follow up with any patient to assure herself that the patient had been appropriately evaluated. She did not report the matter to any agency or licensing board for examination. She did not lay out the $150 to purchase the calibration syringe herself, which would have solved any perceived or real problem. She did not tell her attorney (whom she was consulting about other matters) that there were problems with the quality of medical care in the Oxford office, or that she was concerned about the commission of any fraud on the Government. And she did not quit her job and dissociate herself from what she later claimed to be a shoddy medical operation.

In short, Dr. Mikes did nothing that a caring physician and licensed professional would, could or should have done after learning of what she believed to be a serious deficiency in medical care. At most, she stopped ordering spirometries for her patients, sending them instead to a local hospital. Frankly, the Court harbors considerable doubt that Dr. Mikes took even this step; but she admittedly evidenced no care or concern for anyone who was not her own patient or for any medical personnel other than herself. Though I asked repeatedly that she explain herself, Dr. Mikes could offer no good reason for her curious behavior. From this, the Court concludes that Dr. Mikes was not terribly concerned during the autumn of 1991 that the office was not in compliance with the ATS recommendations.

*(3) Employment Ends and Lawsuit Begins*

I tend to believe that Dr. Mikes' days with Oxford were numbered from the be-

ginning. However, by November 1991, Dr. Straus and Dr. Friedman concluded that they could not work with her and they wanted her out. Dr. Ambinder testified that he restrained his partners for about a month, promising to meet periodically with Dr. Mikes to try to help her over her interpersonal difficulties. He claims to have had four to six such meetings, at which Dr. Mikes complained about failure to take her phone messages but not about deficiencies in patient care. Dr. Mikes contends that no such meetings ever took place. I credit Dr. Ambinder. By mid-December even he had given up, and the practice served notice, by letter dated December 15, 1991, that Dr. Mikes' employment would be terminated ninety days hence, or sooner if the defendants so chose.

The parties differ over the legal niceties surrounding the termination. The defendants sent Dr. Mikes a letter terminating her for cause for failure to obtain and maintain admitting privileges at Peekskill Hospital (PX–36). As noted above, pursuant to Paragraph 10.A.ii. of her employment contract, this fact entitled her employers to terminate her immediately (i.e., without any notice) and did not implicate the 90 day notice provision for a non-cause termination found in Paragraph 10.B. Nonetheless, defendants claim that they offered Dr. Mikes three additional months employment—to which they believed she was not contractually entitled—out of the goodness of their hearts, and in order to give her time to find a new job. Dr. Mikes and her counsel believed that she was entitled to three months notice of termination pursuant to Paragraph 10.B, in that the real reason for her termination was not failure to maintain admitting privileges or anything else that constituted "cause" under Paragraph 10.A. of the employment

contract. They therefore viewed the offer of "up to" 90 days' employment (at defendants' option) as an attempt to modify her employment contract, and they declined to accept it. Dr. Mikes left the practice at the beginning of January. She demanded six months' severance. Dr. Straus and his partners refused.

Dr. Straus testified that, when he refused Dr. Mikes' demand of six months severance pay in the amount of $65,000, Dr. Mikes responded, "You will pay." (Straus Aff. ¶ 11.) I believe that Dr. Mikes said something along these lines.

However, no one testified that Dr. Mikes threatened the defendants with a fraud suit upon her departure from Oxford Medical Group. And frankly, there is nothing in this record to indicate that such an idea had so much as crossed her mind. Although Dr. Mikes testified before me that, during her employment, she both believed and told Dr. Straus that her employers were submitting false and fraudulent bills to Medicare, I do not credit that statement, for four reasons. First, she stood by and did nothing for several months while this alleged fraud was taking place. Second, she did nothing to gather any evidence that would enable her to support any claim of fraud—she did not even make a list of patients who were, in her view, improperly treated.[4] Third, if she had ever alleged that Dr. Straus was committing medicare fraud, he would neither have offered her extra-contractual employment nor behaved as he behaved in the weeks immediately following Dr. Mikes' departure. And fourth, the record reflects that the idea of alleging fraud originated with her attorney, Harold Burke, well after Dr. Mikes was fired.

Mr. Burke first learned of the spirometry issue (as well as Dr. Mikes' contention

---

4. I am not suggesting, as defendants have suggested, that if Dr. Mikes really believed defendants were defrauding the government, she would have surreptitiously pilfered patient files—although there are plenty of people who would have done precisely that if they found themselves in her position. However, I find it implausible that someone who believed a fraud was taking place would not have made notes or gathered some evidence to bolster so serious and sensitive an allegation.

that her employers over-used magnetic resonance imaging, or MRIs, because of their financial interest in a mobile MRI facility—an allegation that was dropped from this action by plaintiff/relator for lack of evidence) on December 20, 1991, five days after plaintiff received the letter of termination. Mr. Burke used this information to argue that her termination had been in violation of public policy "since issues appeared to arise in the employer-employee relationship concerning the propriety of certain employer operating practices," (Burke Aff. at ¶ 7), but it is clear from his affidavit that he was referring to defendants' administration of spirometry and their alleged overuse of Magnetic Resonance Imaging, not to billing practices or false claims. As late as January 6, 1992, Mr. Burke believed that his client had valid claims only for breach of contract and wrongful termination. He did not even broach the subject of a qui tam action with his client until February 7, 1992—after the defendants (for reasons I cannot begin to fathom) refused to pay Dr. Mikes her last month's salary. At that point, Mr. Burke first suggested that the plaintiff shoot at a very small target (one month's unpaid salary and three months' arguable termination pay) with a very big gun (the False Claims Act). There is no credible evidence before me that Dr. Mikes had ever heard of the False Claims Act or a qui tam action before Mr. Burke educated her. Once she learned of it, however, she embraced it wholeheartedly.

Ironically, this long-running soap opera is the sorry result of a series of miscalculations by all concerned. By terminating her contract pursuant to Paragraph 10.B and paying Dr. Mikes the three months' salary they offered her in any event, by not withholding her last months' pay (which appears to this Court to violate the New York State Labor Law, although the matter is not in issue before me), even by meeting her demand for six months' severance—of course, one cannot know for certain, but it seems that any of these might have brought an end to an employment relationship that was a bad idea for everyone. Instead, we have endured eight years of total warfare.

### (4) The Prosecution of This Action

That this matter has been on the Court's docket for over eight years is not entirely the fault of the parties. However, they bear the lion's share of the guilt.

The complaint, as originally filed on April 16, 1992, alleged that defendants had violated the False Claims Act by submitting bills to Medicare for improperly performed and unnecessary spirometries, and that Dr. Mikes had been discharged in retaliation for her challenging her employers about their misconduct. Following an investigation into relator's allegations, the Justice Department declined to prosecute this action.

On July 11, 1994, Dr. Mikes filed an amended complaint, which included new allegations that defendants ordered unnecessary MRI's and ordered that they be performed at Tri–County Mobile MRI, an enterprise in which Drs. Straus and Ambinder had a financial interest. The complaint as amended also included an allegation that these MRI's were ordered as part of an improper fee referral arrangement.

I have reviewed the consulting contract between Drs. Straus an Ambinder and Tri–County, which was entered into at the time the two doctors brought together the parties who founded Tri–County. As defendants point out, it provides for a flat fee each year ($60,000) for "consulting." The consulting fee does not vary with the number of referrals that Oxford Medical Group made to Tri–County. Of course, Tri–County needed to be financially successful for Drs. Straus and Ambinder to receive their flat fee, and this could have provided them with some incentive to favor Tri–County over other MRI providers.[5] How-

---

5. Dr. Straus' bald statement in his affidavit that "We had no interest in the MRI facilities

ever, plaintiff had no hard evidence of such favoritism at the time she amended the complaint, and she developed none over the course of several years of litigation. Indeed, the plaintiff has identified only one person who was inappropriately told to have an MRI—one Mrs. D, whose recurrent lung cancer was not detected by MRI and was found (too late) via simple chest x-ray. But Mrs. D's case, while arguably malpractice, could not form the basis for a False Claims Act claim. Despite Mr. Burke's allegation "on information and belief" that Mrs. D was a Medicare patient, she was in fact in her late forties when she was seen at Oxford—a fact that should have been apparent to Dr. Mikes, and that could easily have been ascertained during discovery (it appears that the question was never asked). Eventually, plaintiff dropped her allegation that defendants submitted unnecessary MRI claims to Medicare.

As for the spirometry billing claims, which were all that remained after this Court undertook to decide the summary judgment motion, there are significant holes in their factual underpinnings as well. Mr. Burke has submitted an affidavit, in which he avers that he did substantial research into Dr. Mikes' claims both before filing them and during the course of the case, and I have no doubt that he did. In particular, as relates to spirometry, he avers, "Each expert consulted unconditionally stated that without periodic calibration a so called "spirometry exam" had no medicinal, therapeutic or diagnostic value of any kind." (Burke Aff. at ¶ 15.) However, despite the fact that the ATS recommends daily calibration (and this Court accepts the ATS recommendation as the gold standard), Dr. Mikes never offered any evidence to support a claim that spirometry conducted on a machine that was calibrated "periodically" but not "daily" is of no medical value. At most, the affidavit of relator's expert, Dr. Paul Enright, M.D.,

states that the failure to calibrate the machine on a daily basis creates an unacceptable risk of inaccurate results (Enright Aff. ¶ 18)—which hardly qualifies as an "unconditional" statement that spirometries conducted on machines that are calibrated per the manufacturer's recommendation have "no medicinal, therapeutic, or diagnostic value of any kind." Dr. Mikes never established that the machine was not calibrated during its periodic service checks by the manufacturer. She offered evidence that the machine was not calibrated in the office, but no one representing defendants has ever claimed that it was.

Moreover, Mr. Burke admits that he obtained copies of the ST–90 service and instruction manuals directly from the manufacturer in Japan. He avers that these materials supported his belief that plaintiff's fraud claims had merit. However, as noted above, the manufacturer's information says nothing whatever about daily calibration; indeed, it quite clearly states that calibration is not necessary, need be checked only "periodically" (which in my thesaurus is not synonymous with "daily"), and that the calibration syringe is "optional." Nothing in the Fukuda materials can be read to support any conclusion that the defendants were committing fraud by billing Medicare for spirometry conducted on a Fukuda machine that was serviced in accordance with the manufacturer's service recommendations.

To say that discovery in this matter proceeded at a desultory pace would be an understatement. Relator and her counsel have complained repeatedly during the six months or so that I have had this case on my docket that defendants withheld relevant documents that would doubtless have enabled them to make out their case. However, my review of the docket sheet reveals that not a single motion to compel

---

we referred our patients to" is simply false. He and Dr. Ambinder did not have an interest in all the facilities they used, but they did

have an interest in Tri–County—to the tune of $60,000 a year—and they did refer patients to that facility.

was made during the entire course of this action. Mr. Burke's excuse for not pursuing alleged discovery defalcations [6]—"I didn't think Judge Conner would be receptive to a motion"—is so lame, and so contrary to good legal practice, that it has caused this Court to wonder whether something else was going on.

The long and the short of it is, by the time the case wended its way to this judge, it was well over seven years old. Summary judgment motions authorized by Judge Conner had been made and fully briefed. They were decided on the record submitted to the Court. The absence of evidence was critical to the Court's decision. Any deficiencies in the proof were the product of inattention by counsel going back many years, and are irrelevant to an assessment of this application.

## CONCLUSIONS OF LAW

The attorney's fee provision of the False Claims Act provides with respect to prevailing defendants:

> If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

31 U.S.C. § 3730(d)(4).

As Defendants point out, this statute is quite clear on its face. It is clear, for example, that the decision whether to award fees is purely discretionary with the Court. Moreover, fees are only to be awarded where the underlying action was *clearly* frivolous or *clearly* vexatious or *primarily* harassing in nature—and even then, an award is not mandatory.

**6.** Defendants claim that they sent letters to Mr. Burke offering him the opportunity to inspect their files. They have submitted several such letters as exhibits. There is no

*(1) Frivolousness*

■ The first inquiry under § 3730(d)(4) is whether relator's complaint was clearly frivolous. To the extent of her claims based on negligently performed spirometry, I conclude that it was not.

First, at the time Dr. Mikes filed her complaint, the legal theory underlying her spirometry claims—i.e., that submission of claims to the government for services that do not conform to the relevant professional standard of care may run afoul of the False Claims Act—was (and remains) an issue of first impression in this circuit. Dr. Mikes' argument was squarely rejected by the Seventh Circuit in *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730 (7th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 562, 145 L.Ed.2d 439 (1999), in a decision I find persuasive. But that decision was handed down only last year. The unsettled state of the law on the question earlier in the decade precludes a finding of frivolousness. Indeed, during the pendency of relator's suit, her position was accepted by one federal district court in *United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma, Inc.*, 945 F.Supp. 1485 (W.D.Okla.1996). Finally, Dr. Mikes did come forth with evidence to support her argument in the form of an affidavit from her expert, Dr. Paul Enright, M.D., stating that failure to calibrate a spirometer in accordance with ATS guidelines entailed an unacceptable risk of inaccurate results. I therefore cannot conclude that Dr. Mikes's FCA claim was so lacking in legal merit and evidentiary support as to warrant the imposition of attorneys' fees against her. *Cf. United States ex rel. Pentagen Technologies Int'l, Ltd. v. CACI Int'l, Inc.*, No. 94 Civ. 2925, 1996 WL 11299, *14 (S.D.N.Y. Jan.4, 1996) (denying attorneys' fees under § 3730(d)(4) where applicability of FCA's original source rule was unclear from prior case law).

evidence in the record before me that these letters were not received. Apparently, Mr. Burke chose not to accept this offer.

■ The same cannot be said with respect to Dr. Mikes's FCA claims for needlessly performed MRI testing. Again, the only patient alleged by Dr. Mikes to have undergone fraudulent MRI testing was "Mrs. D.," who, as a woman in her forties, was not a Medicare patient. Thus, the alleged improper testing could not possibly have come within the ambit of the FCA. And apart from the financial interest of Drs. Straus and Ambinder in Tri–County, Dr. Mikes never had any evidence that any of their MRI referrals, whether to Tri–County or any other provider, were unnecessary—a deficiency that led her to withdraw this claim by filing a Supplemental Complaint in July 1999. The utter lack of evidentiary basis for Dr. Mikes's MRI-related claims leads me to find that those claims were clearly frivolous under § 3730(d)(4).

*(2) Vexatiousness/Intent to Harass*

■ The case law identifying vexatious or harassing litigation under the False Claims Act is not copious. The few courts that have granted attorneys' fees to prevailing defendants under § 3730(d)(4) have done so in cases where the relator brought a duplicative suit under the FCA involving facts and issues that had already been decided in prior litigation, *see, e.g., United States ex rel. Sampson v. Crescent City E.M.S., Inc.,* No. Civ. A 96–3505, 1997 WL 570688 (E.D.La. Sept.12, 1997); *United States ex rel. Herbert v. Nat'l Academy of Sciences,* Civ. A. No. 90–2568, 1992 WL 247587 (D.D.C. Sept.15, 1992), where the plaintiff had engaged in an extended pattern of harassment against the defendants prior to bringing suit, *see, e.g., Millner v. ITT Aerospace/Communications Div. of ITT Corp., Inc.,* No. 95–3545, 1997 WL 415238 (7th Cir. July 21, 1997), or where

the government's undisputed prior knowledge of information alleged to constitute fraud defeated any inference of a false claim. *See, e.g., id.; United States ex rel. Minna Ree Winer Children's Class Trust v. Regions Bank of Louisiana,* Civ. A. No. 94–4085, 1996 WL 264981 (E.D.La. May 17, 1996).

None of the above-cited cases is analogous to the one before me. There is no history of prior litigation by Dr. Mikes against the defendants in her qui tam action. Relator has not carried out the sort of harassment deemed by the Seventh Circuit to merit a fee award in *Millner,* in which the plaintiff picketed defendant's property for over 15 weeks, conducted a defamatory letter-writing campaign to various public officials, and filed baseless charges against the defendant with the National Labor Relations Board and Equal Opportunity Employment Commission before bringing his FCA claim. *See Millner,* 1997 WL 415238, at *6. Nor was there any suggestion during the litigation that the Social Security Administration was aware of the alleged wrongdoing when it made payments to defendants.

Further guidance is provided by cases addressed to attorneys' fee awards to defendants under the fee-shifting provision in civil rights actions, 42 U.S.C. § 1988(b), which § 3730(d)(4) is intended to track, *see* Sen.Rep. No. 99–345, 99th Cong., 2nd Sess.1986, 1986 U.S.C.C.A.N. 5266, 1986 WL 31937, as well as Fed.R.Civ.P. 11, to which the Second Circuit has looked in applying § 1988.[7] *See, e.g., LeBlanc–Sternberg v. Fletcher,* 143 F.3d 765, 770 (2d Cir.1998) (citing *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)).

---

7. Section 1988 provides:

In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985 and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C.A. § 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.A. § 2000bb et seq.], title VI of the

Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. . . .

42 U.S.C. § 1988(b).

In order to award attorneys' fees to a prevailing defendant under § 1988, a district court must find that "the plaintiff's action was frivolous, unreasonable, or without justification, even though not brought in subjective bad faith." *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). In *American Federation of State, County and Municipal Employees, AFL—CIO (AFSCME) v. County of Nassau*, 96 F.3d 644 (2d Cir.1996), the Second Circuit reviewed a number of its prior decisions in which the plaintiffs' claims were found to have met the *Christiansburg* standard:

> We have indicated in particular cases what is meant by "frivolous, unreasonable, or without foundation." In *Gerena-Valentin v. Koch*, 739 F.2d 755, 756–57 (2d Cir.1984), the plaintiff claimed that two municipal employees conspired to keep him off the ballot in an election for New York City councilman, in violation of the Voting Rights Act, 42 U.S.C. § 1973 *et seq.* . . . . [W]e approved a fee award to the prevailing defendants because the plaintiff had already litigated the issue (unsuccessfully) in state court, and because "at no time ... did [the plaintiff] attempt to produce any evidence whatsoever in support of his retaliation and conspiracy claim." *Id.* at 761. In *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 246 (2d Cir.1985), a general contractor charged the City of New York and others with violating the antitrust and civil rights laws by prohibiting it from contracting with other companies "engaged in City-financed reconstruction projects." . . . . [W]e approved a fee award to the defendant because the plaintiff "could not point to a deprivation of any single right conferred by federal law or the ... Constitution," and had unsuccessfully challenged the City's action in state court. *Id.* at 252. And in *Faraci v. Hickey–Freeman Co.*, 607 F.2d 1025, 1027–29 (2d Cir.1979), we approved a fee award against a Title VII plaintiff where the evidence of non-discrimination was "uncontradicted."

*AFSCME*, 96 F.3d at 650–51 (2d Cir.1996). Here, as stated above, relator did produce some evidence to support her spirometry claim—i.e., Dr. Enright's testimony and her own. She has produced no evidence, however, to support her claim of fraudulent and unnecessary MRI referrals.

Finally, the Second Circuit has held, in the context of Rule 11, that where a district court deems a claim not to be frivolous, the court may not impose sanctions on the ground that the claim was brought for an improper motive—this despite the fact that harassment as an improper purpose is specifically mentioned in Rule 11.[8] In *Sussman v. Bank of Israel*, 56 F.3d 450 (2d Cir.1995), the plaintiffs were sued in Israel following the collapse of the bank of which they were founders and directors, and brought a third-party claim against the bank's insurer, alleging, *inter alia*, that the insurer had manipulated the bank's stock price by extending a loan to

---

**8.** Rule 11 provides in pertinent part:

(b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of that person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law of the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed.R.Civ.P. 11(b).

the bank to avoid its failure. *See id.* at 452. The plaintiffs then brought an action against the bank in federal court in New York, making substantially the same allegations. Before filing the complaint, their counsel in the U.S. action sent letters to several Israeli government officials warning them of the plaintiffs' intention to sue, and proposed settlement discussions, citing the potential of the case to generate negative publicity and discourage U.S. investment in Israel. *See id.* at 453.

After dismissing the plaintiffs' complaint on forum non conveniens grounds, the district court imposed sanctions of $50,000 against their attorney under Rule 11, stating that although it did not reach the merits of the complaint, it had decided to award sanctions for what it viewed as the "manifestly improper purpose which played a significant part in plaintiffs' motivation for filing their complaint." *Id.* at 454–55. Specifically, the court concluded, based in part on the plaintiffs' letter to Israeli officials, that the filing of the complaint in the New York litigation was designed to force the withdrawal of the Israeli action by threatening the Israeli government with negative publicity. *See id.* at 455.

The Second Circuit reversed, concluding that, because violations of Rule 11 are determined with reference to the objective soundness of the complaint, not the subjective intent of the filer, a district court may not properly impose sanctions for the filing of a nonfrivolous complaint simply because a plaintiff's motive is not proper. *See id.* at 459. The Circuit adopted the analysis of the Ninth Circuit in *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358 (9th Cir.1990), which noted that because the enforcement of a plaintiff's private rights through the filing of a non-frivolous complaint may benefit the public through advancement of public policies, "it would be counterproductive to use Rule 11 to penalize the assertion of non-frivolous claims, even when the motives for asserting those claims are not entirely pure." *Sussman*,

56 F.3d at 459 (citing *Townsend,* 929 F.2d at 1362). The Second Circuit added that "[a] party should not be penalized or deterred from seeking and obtaining warranted judicial relief merely because one of his multiple purposes in seeking that relief may have been improper." *Id.* at 459.

Turning to the facts before it, the court concluded that mere warnings by a party of its intention to file non-frivolous claims, with predictions of consequent negative publicity, are not improper. *See id.* Because the district court had not found the plaintiffs' complaint to be frivolous, the Circuit concluded, the award of sanctions under Rule 11 was improper.

Reasoning from *Sussman,* I conclude that counsel fees cannot be awarded on Dr. Mikes's spirometry-related claims. That leaves the question of relator's allegations of improper MRI referrals. Dr. Mikes did not adduce any evidence in support of her improper MRI referrals claim. As *AFSCME, supra,* indicates, the complete absence of evidentiary support points to vexatiousness and primary intent to harass. I therefore conclude that Dr. Mikes's MRI-based claims were vexatious and brought with the primary intent to harass defendants.

This does not end the matter, however. Although defendants can receive an award of attorneys' fees expended in defense of the MRI claim, it is not mandatory that they receive those fees. Whether to make a fee award to a qualifying defendant, and in what amount, is a matter of the district court's discretion. In this regard, I can take into account, for example, the false testimony given by Dr. Straus at trial that Dr. Mikes's proposal for the development of a pulmonary clinic at Oxford was a fabrication, that he never used the name "Oxford Medical Group" until immediately before he incorporated the practice under that name, and that he had no interest in any MRI facilities to which the practice made referrals.

"[T]he district court is vested with broad discretion to fashion an appropriate sanction" under § 3730(d)(4). *Pentagen,* 1996 WL 11299 at *13. *See also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1336 at 102 (2d ed.1990) (noting that under Rule 11 "district courts have discretion to tailor the sanction to the violation"). Dr. Straus's testimonial lapses suggest that he does not deserve to recover his share of the monies expended. Accordingly, I award the defendants two-thirds of any attorneys' fees that they can establish were attributable to the defense of the MRI claims. As the records before me do not sufficiently distinguish between the two claims asserted, I refer the matter to The Hon. George A. Yanthis for a report and recommendation, to be delivered within 60 days. If the attorneys' records do not delineate between services rendered for the two different claims, I authorize a default fee award in the amount of five thousand dollars ($5,000.00), to be split between Dr. Ambinder and Dr. Friedman.

## CONCLUSION

Defendants' application for an award of attorneys' fees and expenses under 31 U.S.C. § 3730(d)(4) is granted with respect to relator's claims for improper MRI referrals only, and denied with respect to her remaining claims. Furthermore, defendants may recover only two-thirds of their attorneys' fees expended in connection with relator's MRI claims.

This constitutes the order and decision of the Court.