Patricia S. MIKES, U.S. Gov't. Ex Rel., Patricia S. Mikes, Plaintiff–Appellant–Cross–Appellee,

v.

Marc J. STRAUS, Jeffrey Ambinder, Eliot L. Friedman, Defendants–Appellees–Cross–Appellants.

Docket Nos. 00–6269, 00–6270.

United States Court of Appeals, Second Circuit.

Argued May 23, 2001.

Decided Dec. 19, 2001.

Harold R. Burke, Greenwich, CT (Holland Kaufmann & Bartels, LLC, Greenwich, Connecticut, of counsel), for Plaintiff–Appellant Patricia S. Mikes, M.D.

Barry B. Cepelewicz, White Plains, NY (David J. Meiselman, Arthur G. Larkin,

Meiselman, Denlea, Packman & Eberz, P.C., White Plains, NY, of counsel), for Defendants–Appellees Marc J. Straus, M.D., Jeffrey M. Ambinder, M.D. and Eliot L. Friedman, M.D.

Gideon A. Schor, Assistant United States Attorney, New York, NY, (Jeffrey Oestericher, Assistant United States Attorney, Mary Jo White, United States Attorney for the Southern District of New York, New York, NY, of counsel), for Amicus Curiae United States of America.

Jessie K. Liu, Washington, DC (Paul M. Smith, Robert M. Portman, Jenner & Block, LLC, Washington, DC, of counsel), for Amici Curiae American Medical Association, Medical Society of the State of New York, American Academy of Family Physicians, American Academy of Orthopaedic Surgeons, American Association of Neurological Surgeons–Congress of Neurological Surgeons, American College of Chest Physicians, American Society of Cataract and Refractive Surgery, and Association of American Medical Colleges.

Anthony L. DeWitt, Jefferson City, MO (Bartimus, Frickleton, Robertson & Obetz, PC, Jefferson City, MO, of counsel), filed a brief for the American Association for Respiratory Care as Amicus Curiae.

Amy M. Wilken, Washington, DC (Dylan G. Trache, Taxpayers Against Fraud, The False Claims Act Legal Center, Washington, DC; Bruce J. Terris, Terris, Pravlik & Millian, LLP, Washington, DC, of counsel), filed a brief for Taxpayers Against Fraud, The False Claims Act Legal Center as Amicus Curiae.

Before: CARDAMONE, PARKER, Circuit Judges, and SPATT,\* District Judge.

---

\* Hon. Arthur D. Spatt, United States District Court Judge for the Eastern District of New York, sitting by designation.

CARDAMONE, Circuit Judge.

On this appeal we review a complaint asserting violations of the False Claims Act (Act), 31 U.S.C. § 3729 *et seq.* (1994), brought by a plaintiff employee against her former employers, who are health care providers. The appeal raises issues of first impression in this Circuit concerning the applicability of medical standards of care to the Act.

Congress enacted the False Claims Act after disclosure of widespread fraud during the War–Between–The–States revealed that the union government had been billed for nonexistent or worthless goods, had been charged exorbitant prices, and had its treasury plundered by profiteering defense contractors. *See United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). In 1986 the Act was substantially amended to combat fraud in the fields of defense and health care. *See* S.Rep. No. 99–345, at 2–4, 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5267–69, 5273. As of February 2000 over half of the $3.5 billion recovered since that amendment derived from cases alleging fraud against the Department of Health and Human Services. *See* Shelley R. Slade & Thomas A. Colthurst, *Health–Care Fraud and the False Claims Act: The Supreme Court Supports a Federal Weapon,* 10 Bus. L. Today, Sept.-Oct.2000, at 24, 27.

The Act contains a *qui tam* provision designed to encourage private individuals to file suit by offering them a percentage of any money recovered. Those persons bringing a *qui tam* suit are known colloquially as whistle-blowers. The plaintiff in this case purports to blow the whistle on those practices of her employers she believes violate the Medicare statute, payment for which would defraud the government. Regardless of whether such suit is successful or unsuccessful (and here it is unsuccessful), a tale-bearer stands out, and

risks being thought as bad as those alleged to be the tale-makers.

## BACKGROUND

### A. *Facts*

In 1991 defendants Dr. Marc J. Straus, Dr. Jeffrey Ambinder and Dr. Eliot L. Friedman, physicians specializing in oncology and hematology, formed a partnership called Pulmonary and Critical Care Associates to extend their practice to include pulmonology, the branch of medicine covering the lungs and related breathing functions. In July of that year defendants hired plaintiff Dr. Patricia S. Mikes, a board-certified pulmonologist, to provide pulmonary and critical care services in defendants' offices in Westchester and Putnam Counties, New York. In September 1991 Mikes discussed with Dr. Straus her concerns relating to spirometry tests being performed in defendants' offices. Three months later, plaintiff was fired.

The parties dispute the reason for Mikes' termination. Plaintiff says she was fired because she questioned how defendants conducted their medical practice. Defendants declare that Mikes' employment agreement provided she was terminable-at-will, and that plaintiff had difficulty procuring privileges at area hospitals.

On April 16, 1992 Mikes commenced the instant litigation against defendants in the United States District Court for the Southern District of New York, asserting not only causes of action for retaliatory discharge and unlawfully withheld wages, but also a *qui tam* suit under the False Claims Act. She served the complaint on the United States Attorney who, on April 19, 1993, notified the district court that it declined its statutory right to substitute for Mikes in the prosecution of this litigation. *See* 31 U.S.C. § 3730(b)(2), (b)(4)(B).

## B. *Prior Proceedings*

Plaintiff's *qui tam* cause of action under the Act alleged that defendants had submitted false reimbursement requests to the federal government for spirometry services. Plaintiff contended that defendants' failure to calibrate the spirometers rendered the results so unreliable as to be "false" under the Act. In addition, Mikes averred that spirometry is an eligible service under the Medicare statute, and that defendants submitted Medicare claims for reimbursement during the period relevant to this dispute—now said to be 1034 claims from 1986 through 1993—for a total Medicare payout of $28,922.89.

After the government declined to take over as plaintiff, Mikes served defendants with her complaint on December 22, 1993. District Court Judge Vincent L. Broderick, before whom the complaint was then pending, dismissed it in May 1994 finding fraud had not been pleaded with particularity as required by Fed.R.Civ.P. 9(b). *See United States ex rel. Mikes v. Straus*, 853 F.Supp. 115, 118 (S.D.N.Y.1994).

Mikes then filed an amended complaint repeating the spirometry, retaliation and withholding wages claims, and also asserting that defendants improperly received Medicare reimbursement for referrals to Magnetic Resonance Imaging (MRI) facilities in which they held a financial interest. It was Mikes' contention that receipt of these referral fees violated the anti-kickback provision of the Medicare statute, 42 U.S.C. § 1320a–7b(b)(1) (1994), and thus defendants' claims for reimbursement for the MRIs also violated the False Claims Act. District Court Judge William C. Conner, now assigned to the case, denied a motion to dismiss the False Claims Act causes of action, and ordered arbitration of the employment-based claims. *See Mikes v. Strauss*, 889 F.Supp. 746, 751–57 (S.D.N.Y.1995).

Mikes then filed in March 1996 a second amended complaint that eliminated the claim for improperly withheld wages, and on July 20, 1999 filed a three count supplemental complaint—the pleading relevant to the present appeal—containing only the spirometry claims brought under the False Claims Act. The case was again reassigned, this time to District Court Judge Colleen McMahon.

Defendants moved for summary judgment on August 13, 1999, and the government again chose not to intervene. In granting defendants' motion on November 18, 1999, the district court ruled that submitting a claim for a service that was not provided in accordance with the relevant standard of care does not make that claim false or fraudulent for False Claims Act purposes. *United States ex rel. Mikes v. Straus*, 84 F.Supp.2d 427, 433 (S.D.N.Y. 1999). Defendants' submission of claims for reimbursement, the court continued, did not implicitly certify that their performance of spirometry conformed to any qualitative standard. *See id.* at 436–38. And, it concluded, that even were the Medicare claims objectively false, plaintiff had not shown defendants submitted the claims with the requisite scienter. *See id.* at 438–39. Plaintiff's motion for reconsideration was denied. *United States ex rel. Mikes v. Straus*, 78 F.Supp.2d 223, 224 (S.D.N.Y.1999).

After plaintiff's complaint had been dismissed, defendants asked for attorneys' fees pursuant to § 3730(d)(4) of the Act. The district court conducted a two-day bench trial and found plaintiff's withdrawn MRI claims were vexatious, but that her spirometry claims were not. *See United States ex rel. Mikes v. Straus*, 98 F.Supp.2d 517, 529 (S.D.N.Y.2000). It held that defendants Ambinder and Friedman were entitled to either two-thirds of any attorneys' fees attributable solely to

defending the MRI claims or a default fee of $5000. *See id.* at 530.

Despite defendants' declaration that they had expended $437,000 defending the action, the district court agreed with the magistrate judge—to whom the attorneys' fees issue had been referred—that defendants' records did not sufficiently delineate the time spent between the MRI and spirometry causes of action. Judge McMahon accordingly awarded defendants only the default sum of $5000. From this disposition, plaintiff appeals the grant of summary judgment and the award of attorneys' fees for defendants. Defendants cross-appeal with respect to the amount of the attorneys' fees award.[1] We affirm.

### C. *Spirometry*

Before turning to a discussion of the law, it will be helpful to define spirometry—a subject that lies at the heart of this case—and plaintiff's allegations regarding defendants' performance of this diagnostic test. Spirometry is an easy-to-perform pulmonary function test used by doctors to detect both obstructive (such as asthma and emphysema) and restrictive (such as pulmonary fibrosis) lung diseases. The type of spirometers used by defendants measures the pressure change when a patient blows into a mouthpiece, thereby providing the doctor with on-the-spot analysis of the volume and speed by which patients can exhale. The spirometry equipment consists of readily transportable lightweight machines, and defendants apparently used at least one in each of their several offices.

Plaintiff's expert stated that spirometers are susceptible to inaccuracy through time and usage because they become clogged, causing false readings. Erroneous measurements may also arise from damage to the instrument through cleaning or disturbance during transport, or from variations in barometric pressure, temperature or humidity. Mikes claims that guidelines first published in 1979 and later updated in 1987 and 1994 by the American Thoracic Society (ATS guidelines), a division of the American Lung Association, set out the generally accepted standards for spirometry. To ensure accuracy, these guidelines recommend daily calibration of spirometers by use of a three liter calibration syringe, the performance of three successive trials during test administration and the appropriate training of spirometer technicians. In support of her contention that the ATS guidelines are the medical standard for spirometry, Mikes notes they are incorporated by reference in the federal Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 902(10) (1994), and included in regulations promulgated pursuant to the Social Security Act, *see* 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A, § 3.00(E) (2001), the Radiation Exposure Compensation Act, *see* 28 C.F.R. § 79.36(d)(1)(ii)(B)(1) (2001), and the Federal Mine Safety and Health Act, 52 Fed. Reg. 34,460, 34,551 (Sept. 11, 1987).

Mikes maintains further that defendants' performance of spirometry did not conform to the ATS guidelines and thus would yield inherently unreliable data. She argues that defendants allowed medical assistants to perform spirometry tests when they were not trained in its proper administration. Plaintiff states she personally observed the medical assistants fail

---

**1.** In addition to the extensive briefs submitted by the parties, we have before us a number of *amicus* briefs submitted by the American Association for Respiratory Care and Taxpayers Against Fraud in support of plaintiff, by a coalition of Medical Societies (including the American Medical Association) in support of defendants, and by the United States urging vacatur and remand. In the discussion that follows we have considered the various arguments raised in these briefs.

to calibrate the spirometer daily and that she was informed the assistants could not recall the last time the machine had been calibrated. Moreover, defendants did not possess a three liter calibration syringe, nor did the assistants properly instruct the patients during the administration of the test or perform three successive tests.

Defendants insist that after plaintiff raised her concerns regarding the spirometer and its use in their practice, they told her to review exam results for inaccuracy, and to train the medical assistants in proper spirometric administration. Dr. Straus reports that plaintiff did not apprise the practice of any false readings in response to this directive, nor did she supervise the medical assistants. With this factual background, we turn to the law.

## DISCUSSION

### I Elements of Plaintiff's False Claims Act Causes of Action

Mikes challenges the district court's grant of summary judgment to defendants that resulted in the dismissal of her False Claims Act causes of action. Summary judgment is a remedy we review *de novo*, *see Hamilton Bank, N.A. v. Kookmin Bank*, 245 F.3d 82, 89 (2d Cir.2001), affirming only if we conclude "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Liability under the False Claims Act occurs when a person

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. § 3729(a). Plaintiff brought suit under each of these subdivisions, but since our analysis applies equally to all three, we limit discussion primarily to the first. As the language of that subdivision makes clear, to impose liability under the Act Mikes must show that defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury. Because plaintiff's claims fail on other grounds, we need not decide whether the Act contains another element of proof, namely a showing that the United States sustained damages. *Cf. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 n. 7 (4th Cir.1999) (noting split of authority on whether False Claims Act contains damages element). We set out briefly the requirements of the above five elements.

■ The Act expansively defines the term "claim" to cover "any request or demand, whether under a contract or otherwise, for money or property ... if the United States Government provides any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). As required by the Medicare implementing regulations, *see* 42 C.F.R. § 424.32 (2000), defendants submitted Medicare reimbursement claims for spirometry on form "HCFA–1500" or an electronic equivalent. Each submission of the HCFA–1500 form meets the first two elements of a False Claims Act cause of action in that it qualifies as a claim made to the United States government. *See United States v. Krizek*, 111 F.3d 934, 940 (D.C.Cir.1997) (holding that number of

claims under Act based upon submission of HCFA–1500 forms).

■ Regarding the third element, the term "false or fraudulent" is not defined in the Act. A common definition of "fraud" is "an intentional misrepresentation, concealment, or nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right." *Webster's Third New International Dictionary* 904 (1981). "False" can mean "not true," "deceitful," or "tending to mislead." *Id.* at 819. The juxtaposition of the word "false" with the word "fraudulent," plus the meanings of the words comprising the phrase "false claim," suggest an improper claim is aimed at extracting money the government otherwise would not have paid. *See* Clarence T. Kipps, Jr. *et al., Materiality as an Element of Liability Under the False Claims Act,* A.B.A. Center for Continuing Legal Educ. Nat'l Inst. (1998), WL N98CFCB ABA–LGLED B–37, B–46 ("[A] claim cannot be determined to be true or false without consideration of whether the decisionmaker should pay the claim—that is, a claim is 'false' only if the Government or other customer would not pay the claim if the facts about the misconduct alleged to have occurred were known.").

This notion also applies to subdivisions (2) & (3) of 31 U.S.C. § 3729(a). The former prohibits a party from knowingly using or making "a false record or statement *to get a false or fraudulent claim paid or approved* by the Government," *id.* § 3729(a)(2) (emphasis added), while the latter prohibits conspiring "to defraud the Government *by getting a false or fraudulent claim allowed · or paid,*" *id.* § 3729(a)(3) (emphasis added). The language of these provisions plainly links the wrongful activity to the government's decision to pay.

On this appeal, the parties dispute whether defendants' Medicare claims rise to the level of being false or fraudulent. They disagree, in addition, as to the fourth element—*i.e.,* whether any false or fraudulent claims were "knowingly" made. The Act defines "knowingly" as either: (1) possessing actual knowledge; (2) acting in deliberate *ignorance of falsity;* or (3) acting in reckless disregard of falsity. *See id.* § 3729(b).

■ The fifth element of the Act further supports the conclusion that the statute reaches only those claims with the potential wrongfully to cause the government to disburse money. The Senate Report accompanying the 1986 amendments to the Act states that "[t]he purpose of [the amendments] is to enhance the Government's ability to recover losses sustained as a result of fraud against the Government." S.Rep. No. 99–345, at 1, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266. The Supreme Court has further indicated that the Act's primary purpose is to indemnify the government—through its restitutionary penalty provisions—against losses caused by a defendant's fraud. *See United States ex rel. Marcus v. Hess,* 317 U.S. 537, 549, 551–52, 63 S.Ct. 379, 87 L.Ed. 443 (1943). With these understandings of the Act's language in mind, we turn to plaintiff's contentions.

## II "Legally False" Certification Theory

The thrust of plaintiff's *qui tam* suit is that the submission of Medicare reimbursement claims for spirometry procedures not performed in accordance with the relevant standard of care, that is, the ATS Guidelines—violates the False Claims Act. Mikes relies principally on the "certification theory" of liability, which is predicated upon a false representation of compliance with a federal statute or regulation or a prescribed contractual term. *See* Lisa Michelle Phelps, Note, *Calling off the Bounty Hunters: Discrediting the Use of*

*Alleged Anti–Kickback Violations to Support Civil False Claims Actions,* 51 Vand. L.Rev. 1003, 1014–15 (1998). This theory has also been called "legally false" certification. *See* Robert Fabrikant & Glenn E. Solomon, *Application of the Federal False Claims Act to Regulatory Compliance Issues in the Health Care Industry,* 51 Ala. L.Rev. 105, 111–12 (1999). It differs from "factually false" certification, which involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided. *Id.*

■ Although the False Claims Act is "not designed to reach every kind of fraud practiced on the Government," *United States v. McNinch,* 356 U.S. at 599, 78 S.Ct. 950, it was intended to embrace at least some claims that suffer from legal falsehood. Thus, "a false claim may take many forms, the most common being a claim for goods or services not provided, or *provided in violation of contract terms, specification, statute, or regulation.*" S.Rep. No. 99–345, at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 (emphasis added).

■ Just as clearly, a claim for reimbursement made to the government is not legally false simply because the particular service furnished failed to comply with the mandates of a statute, regulation or contractual term that is only tangential to the service for which reimbursement is sought. Since the Act is restitutionary and aimed at retrieving ill-begotten funds, it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay. Accordingly, while the Act is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government," *United States v. Neifert–White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968), it does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions.

■ We join the Fourth, Fifth, Ninth, and District of Columbia Circuits in ruling that a claim under the Act is legally false only where a party certifies compliance with a statute or regulation as a condition to governmental payment. *See United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1376 (D.C.Cir. 2000) ("[A] false certification of compliance with a statute or regulation cannot serve as the basis for a *qui tam* action under the [False Claims Act] unless payment is conditioned on that certification."); *Harrison,* 176 F.3d at 786–87, 793; *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir. 1997); *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266–67 (9th Cir. 1996).

We add that although materiality is a related concept, our holding is distinct from a requirement imposed by some courts that a false statement or claim must be material to the government's funding decision. *See, e.g., Harrison,* 176 F.3d at 785. A materiality requirement holds that only a subset of admittedly false claims is subject to False Claims Act liability. *Cf. United States ex rel. Cantekin v. Univ. of Pittsburgh,* 192 F.3d 402, 415 (3d Cir. 1999), *cert. denied,* 531 U.S. 880, 121 S.Ct. 192, 148 L.Ed.2d 133 (2000) (finding that *Hopper* held that not every regulatory violation is a "knowingly false statement" and distinguishing this holding from a materiality requirement). We rule simply that not all instances of regulatory noncompliance will cause a claim to become false. We need not and do not address whether the Act contains a separate materiality requirement.

### A. *Express False Certification*

■ We analyze first plaintiff's argument that defendants' claims contained an

express false certification. An expressly false claim is, as the term suggests, a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment.

Plaintiff contends that by submitting claims for Medicare reimbursement on HCFA–1500 forms or their electronic equivalent, defendants expressly certified that they would comply with the terms set out on the form. Form HCFA–1500 expressly says: "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision." Both the form, which further provides "No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations," and the Medicare Regulations, *see* 42 C.F.R. § 424.32, state that certification is a precondition to Medicare reimbursement. We agree that defendants certified they would comply with the terms on the form and that such compliance was a precondition of governmental payment. *Cf. United States ex rel. Piacentile v. Wolk,* Civ.A.No.93–5773, 1995 WL 20833, at *2–*3 (E.D.Pa. Jan.17, 1995) (finding False Claims Act violation where defendant altered Medicare Certificates of Medical Necessity without doctor's authorization, because the forms contained a certification that the claims represented the physician's judgment).

Yet plaintiff's objections to defendants' spirometry tests do not implicate the standard set out in the HCFA–1500 form that the procedure was dictated by "medical necessity." The term "medical necessity" does not impart a qualitative element mandating a particular standard of medical care, and Mikes does not point to any legal authority requiring us to read such a mandate into the form. Medical necessity ordinarily indicates the level—not the quality—of the service. For example, the requisite level of medical necessity may not be met where a party contends that a particular procedure was deleterious or performed solely for profit, *see United States ex rel. Kneepkins v. Gambro Healthcare, Inc.,* 115 F.Supp.2d 35, 41–42 (D.Mass.2000) (procedures chosen solely for defendants' economic gain are not "medically necessary" as required by claim submission form), or where a party seeks reimbursement for a procedure that is not traditionally covered, *see Rush v. Parham,* 625 F.2d 1150, 1156 (5th Cir.1980) (upholding state's exclusion of experimental medical treatment from definition of "medically necessary" services under Medicaid).

This approach to the phrase "medically necessary"—as applying to *ex ante* coverage decisions but not *ex post* critiques of how providers executed a procedure—would also conform to our understanding of the phrase "reasonable and necessary" as used in the Medicare statute, 42 U.S.C. § 1395y(a)(1)(A) (1994) (disallowing payment for items or services not reasonable and necessary for diagnosis or treatment). *See New York ex rel. Bodnar v. Sec'y of Health & Human Servs.,* 903 F.2d 122, 125 (2d Cir.1990) (acknowledging Secretary's authority, in determining whether procedure is "reasonable and necessary," to consider type of service provided and whether service was provided in appropriate, cost-effective setting); *Goodman v. Sullivan,* 891 F.2d 449, 450–51 (2d Cir.1989) (per curiam) (affirming exclusion of experimental procedures from Medicare coverage pursuant to requirement that procedures be "reasonable and necessary"); *see also Friedrich v. Sec'y of Health & Human Servs.,* 894 F.2d 829, 831 (6th Cir.1990) (noting that the Health Care Financing Administration, when determining whether

a procedure is "reasonable and necessary," considers the procedure's safety, effectiveness, and acceptance by medical community).

Moreover, the section of the Medicare statute setting forth conditions of participation has separate provisions governing the medical necessity of a given procedure and its quality. *Compare* 42 U.S.C. § 1320c–5(a)(1) (1994) (practitioner shall assure that the service "will be provided economically and only when, and to the extent, medically necessary"), *with id.* § 1320c–5(a)(2) (1994) (practitioner shall assure that the service "will be of a quality which meets professionally recognized standards of health care"). This statutory design supports the conclusion that the medical necessity for a procedure and its quality are distinct considerations.

Inasmuch as Mikes challenges only the quality of defendants' spirometry tests and not the decisions to order this procedure for patients, she fails to support her contention that the tests were not medically necessary. Nor has she proffered evidence to support an allegation that the defendants did not "personally furnish" the spirometry tests as required by the HCFA–1500 form. The form allows for reimbursement when a procedure is "rendered under the physician's immediate personal supervision by his/her employee," which covers the medical assistants' performance of spirometry at defendants' direction. Thus, plaintiff's cause of action insofar as it is founded on express false certification is without merit.

### B. *Implied False Certification*

#### 1. *Viability of Implied Certification Theory*

■ Plaintiff insists that defendants' submissions to the government for payment were impliedly false certifications. An implied false certification claim is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment. *See* Phelps, *supra*, at 1015. Foundational support for the implied false certification theory may be found in Congress' expressly stated purpose that the Act include at least some kinds of legally false claims, *see* S.Rep. No. 99–345, at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274, and in the Supreme Court's admonition that the Act intends to reach all forms of fraud that might cause financial loss to the government, *see Neifert–White Co.*, 390 U.S. at 232, 88 S.Ct. 959.

The implied certification theory was applied in *Ab–Tech Construction, Inc. v. United States*, 31 Fed.Cl. 429 (Fed.Cl. 1994), *aff'd*, 57 F.3d 1084 (Fed.Cir.1995) (unpublished table decision). The Court of Federal Claims held that the defendants' submission of payment vouchers, although containing no express representation, implicitly certified their continued adherence to the eligibility requirements of a federal small business statutory program. *See id.* at 434. The failure by defendants to honor the terms of this certification rendered their claims for payment false, resulting in False Claims Act liability. *See id.* at 433–34.

But caution should be exercised not to read this theory expansively and out of context. The *Ab–Tech* rationale, for example, does not fit comfortably into the health care context because the False Claims Act was not designed for use as a blunt instrument to enforce compliance with all medical regulations—but rather only those regulations that are a precondition to payment—and to construe the impliedly false certification theory in an expansive fashion would improperly broaden the Act's reach. Moreover, a limited application of implied certification in the health care field reconciles, on the one

hand, the need to enforce the Medicare statute with, on the other hand, the active role actors outside the federal government play in assuring that appropriate standards of medical care are met. Interests of federalism counsel that "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *accord Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

Moreover, permitting *qui tam* plaintiffs to assert that defendants' quality of care failed to meet medical standards would promote federalization of medical malpractice, as the federal government or the *qui tam* relator would replace the aggrieved patient as plaintiff. *See* Patrick A. Scheiderer, Note, *Medical Malpractice as a Basis for a False Claims Action?*, 33 Ind. L.Rev. 1077, 1098–99 (2000). Beyond that, we observe that the courts are not the best forum to resolve medical issues concerning levels of care. State, local or private medical agencies, boards and societies are better suited to monitor quality of care issues. *See* Fabrikant & Solomon, *supra*, at 156–57.

■■■■ For these reasons, we think a medical provider should be found to have implicitly certified compliance with a particular rule as a condition of reimbursement in limited circumstances. Specifically, implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid. *See Siewick*, 214 F.3d at 1376 (holding that court will "infer certification from silence" only when "certification was a prerequisite to the government action sought"). Liability under the Act may properly be found therefore when a defendant submits a claim for reimbursement while knowing—as that term is defined by the Act, *see* 31 U.S.C. § 3729(b)—that payment expressly is precluded because of some noncompliance by the defendant.

### 2. *Plaintiff's Allegations Under the Implied Theory*

Mikes asserts that compliance with §§ 1395y(a)(1)(A) and 1320c–5(a) of the Medicare statute is a precondition to a request for federal funds and that submission of a HCFA–1500 form attests by implication to the providers' compliance with both of those provisions.

■■■■ a. *§ 1395y(a)(1)(A).* Section 1395y(a)(1)(A) of the Medicare statute states that "no payment may be made under [the Medicare statute] for any expenses incurred for items or services which … are not *reasonable and necessary* for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added). Because this section contains an express condition of payment—that is, "no payment may be made"—it explicitly links each Medicare *payment* to the requirement that the particular item or service be "reasonable and necessary." The Supreme Court has noted that this section precludes the government from reimbursing a Medicare provider who fails to comply. *See Heckler v. Ringer*, 466 U.S. 602, 605, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984); *see also United Seniors Ass'n v. Shalala*, 182 F.3d 965, 967 (D.C.Cir.1999) ("If a service is deemed not to have been reasonable and necessary, Medicare will not make payment and the doctor generally is prohibited from charging the patient."); *Mount Sinai Hosp., Inc. v. Weinberger*, 517 F.2d 329, 334 (5th Cir.1975) (explaining that § 1395y controls whether particular services are covered by Medicare).

Since § 1395y(a)(1)(A) *expressly* prohibits payment if a provider fails to comply with its terms, defendants' submission of the claim forms implicitly certifies compliance with its provision.

Yet, Mikes' insistence that defendants' performance of spirometry was not reasonable and necessary is without support. As set forth in our discussion of express certification, the requirement that a service be reasonable and necessary generally pertains to the selection of the particular procedure and not to its performance. *See Goodman*, 891 F.2d at 450–51. While such factors as the effectiveness and medical acceptance of a given procedure might determine whether it is reasonable and necessary, the failure of the procedure to conform to a particular standard of care ordinarily will not. *See id.* at 450 (noting that under § 1395(y)(a)(1)(A) the Secretary of Health and Human Services prohibits "payment of benefits for any experimental, investigational, or unproven treatment or diagnostic method not yet generally accepted in the medical profession"). Since plaintiff contends only that defendants' performance of spirometry was *qualitatively* deficient, her allegations that defendants falsely certified compliance with § 1395y(a)(1)(A) may not succeed.

b. *§ 1320c–5(a).* Plaintiff's implied false certification claims rely more heavily upon § 1320c–5(a). That section does mandate a qualitative standard of care in that it provides

It shall be the obligation of any health care practitioner ... who provides health care services for which payment may be made ... to assure, to the extent of his authority that services or items ordered or provided by such practitioner ...

(1) will be provided economically and only when, and to the extent, medically necessary;

(2) *will be of a quality which meets professionally recognized standards of health care;* and

(3) will be supported by evidence of medical necessity and quality ... as may reasonably be required by a reviewing peer review organization in the exercise of its duties and responsibilities.

42 U.S.C. § 1320c–5(a) (emphasis added).

Mikes avers that the ATS guidelines comprise a "professionally recognized standard of health care" for spirometry, and that defendants' failure to conform to those guidelines violates the Medicare statute. She believes defendants, by submitting HCFA–1500 forms for spirometry tests that did not comply with the ATS guidelines, engaged in implied false certification. But plaintiff's allegations cannot establish liability under the False Claims Act because—unlike § 1395y(a)(1)(A)—the Medicare statute does not explicitly condition payment upon compliance with § 1320c–5(a).

Instead, § 1320c–5(a) simply states that "[i]t shall be the obligation" of a practitioner who provides a medical service "for which payment may be made ... to assure" compliance with the section. Hence, it may be seen that § 1320c–5(a) acts prospectively, setting forth obligations for a provider to be eligible to participate in the Medicare program. *See Fischer v. United States*, 529 U.S. 667, 672, 120 S.Ct. 1780, 146 L.Ed.2d 707 (2000) (describing § 1320c–5(a) as a statutory obligation to qualify to participate in the Medicare program); *see also Corkill v. Shalala*, 109 F.3d 1348, 1350 (9th Cir.1997) ("In order to qualify for reimbursement under the Medicare program, a physician must comply with three statutory requirements [including § 1320c–5(a) ].").

The structure of the statute further informs us that § 1320c–5(a) establishes conditions of participation, rather than pre-

requisites to receiving reimbursement. The statute empowers peer review organizations to monitor providers' compliance with § 1320c–5(a). *See* 42 U.S.C. § 1320c–3(a) (1994). If a peer review organization determines that a provider has "failed in a substantial number of cases" to comply with the requirements of § 1320c–5(a) or that the provider has "grossly and flagrantly violated" the section, the organization may—after reasonable notice and an opportunity for corrective action—recommend sanctions. *See id.* § 1320c–5(b)(1) (1994 & Supp. V 1999). If the Secretary agrees that sanctions should be imposed, and further finds the provider unwilling or unable substantially to comply with its obligations, the Secretary may exclude the provider from the Medicare program. *See id.; see also Doyle v. Sec'y of Health & Human Servs.*, 848 F.2d 296, 298 (1st Cir. 1988) (explaining statutory and regulatory procedures).

The fact that § 1320c–5(b) permits sanctions for a failure to maintain an appropriate standard of care only where a dereliction occurred in "a substantial number of cases" or a violation was especially "gross[ ] and flagrant[ ]" makes it evident that the section is directed at the provider's continued eligibility in the Medicare program, rather than any individual incident of noncompliance. *See* Fabrikant & Solomon, *supra,* at 122–23 (arguing that quality of care standards are conditions of participation in the Medicare program and not conditions of payment). This conclusion is reinforced by the ultimate sanction provided by § 1320c–5(b)(1): exclusion of the provider from Medicare eligibility. Further, the section explicitly provides that the Secretary may authorize an alternate remedy—repayment of the cost of the noncompliant service to the United States— "as a condition to the continued eligibility" of the health care provider in the Medicare program. 42 U.S.C. § 1320c–5(b)(3). Accordingly, § 1320c–5(a) is quite plainly a condition of participation in the Medicare program.

Since § 1320c–5(a) does not expressly condition *payment* on compliance with its terms, defendants' certifications on the HCFA–1500 forms are not legally false. Consequently, defendants did not submit impliedly false claims by requesting reimbursement for spirometry tests that allegedly were not performed according to the recognized standards of health care.

■ Finally, our holding—that in submitting a Medicare reimbursement form, a defendant implicitly certifies compliance with § 1395y(a)(1)(A), but not § 1320c–5(a)—comports with Congress' purpose as discussed earlier in this opinion. Section 1395y(a)(1)(A) mandates that a provider's choice of procedures be "reasonable and necessary"; it does not obligate federal courts to step outside their primary area of competence and apply a qualitative standard measuring the efficacy of those procedures. The quality of care standard of § 1320c–5(a) is best enforced by those professionals most versed in the nuances of providing adequate health care.

### III Worthless Services Claim

The government in its *amicus* brief and plaintiff at oral argument argue that the district court erred by not considering whether the defendants' submission of Medicare claims for substandard spirometry essentially constituted requests for the reimbursement of worthless services. An allegation that defendants violated the Act by submitting claims for worthless services is not predicated upon the false certification theory. Instead, a worthless services claim asserts that the knowing request of federal reimbursement for a procedure with no medical value violates the Act irrespective of any certification.

The Ninth Circuit's recent decision in *United States ex rel. Lee v. SmithKline*

*Beecham, Inc.*, 245 F.3d 1048 (9th Cir. 2001), is the leading case on worthless services claims in the health care arena. In *Lee*, the relator alleged that defendant, an operator of regional clinical laboratories, falsified laboratory test data when test results fell outside the acceptable standard of error. *Id.* at 1050. The Ninth Circuit held that the false certification theory addressed in *Hopper*, 91 F.3d 1261, was only one form of action under the Act, and that the district court should have considered the distinct and separate worthless services claim. *Lee*, 245 F.3d at 1053. As the Ninth Circuit explained, "[i]n an appropriate case, knowingly billing for worthless services or recklessly doing so with deliberate ignorance may be actionable under § 3729 [of the False Claims Act], regardless of any false certification conduct." *Id.*

We agree that a worthless services claim is a distinct claim under the Act. It is effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided. *See* Fabrikant & Solomon, *supra*, at 111–12. In a worthless services claim, the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all.

We nevertheless find no liability in the instant case because plaintiff makes no showing that defendants knowingly—as the Act defines that term—submitted a claim for the reimbursement of worthless services. We have adopted the Ninth Circuit's standard that the "requisite intent is the knowing presentation of what is known to be false" as opposed to negligence or innocent mistake. *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir.1996) (quoted in *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1156 (2d Cir.1993)).

Plaintiff fails to substantiate that defendants knew their Medicare claims for reimbursement were false. At best, plaintiff urges that defendants submitted Medicare claims knowing they did not conform to the ATS guidelines. This allegation alone fails to satisfy the standard for a worthless services claim. The notion of presenting a claim known to be false does not mean the claim is incorrect as a matter of proper accounting, but rather means it is a lie. *See id.* Defendants have presented such overwhelming evidence of their genuine belief that their use of spirometry had medical value, we conclude as a matter of law they did not submit their claims with the requisite scienter.

Initially, the defendants claim to have relied upon the spirometers' instruction manual which—contrary to the ATS guidelines—indicates that daily calibration is not required. Beside the heading "calibration," the manual provides that "[t]he equipment is properly calibrated at the time of shipment so that no calibration is required except for periodical checks." Norman Levine, the defendants' former chief medical assistant and a non-party to this action, testified that he reviewed the spirometers' instruction manual at the time of purchase. A separate product information booklet states without qualification that the spirometer conforms to the ATS guidelines and controlling federal regulations. The booklet identifies a three liter calibration syringe as only an "optional item."

Moreover, Levine testified that the individual spirometers were sent out for periodic servicing, at which time the practice would use loaner machines. Defendant Friedman confirmed that on occasion he would direct Levine to send a spirometer out for recalibration. Levine also averred that he received practical training on the operation of the machine from the sales

technicians who sold the spirometers. Finally, defendant Straus claims that, shortly after the confrontation with plaintiff, he requested that Levine pursue Mikes' complaints regarding the spirometers to see if anything could be done to rectify the alleged problem. Levine asserts that in response he thoroughly reviewed the practice's spirometry procedures and found no fault.

Defendants have thus proffered ample evidence—most of which derives from disinterested non-party witnesses—supporting their contention that they held a good faith belief that their spirometry tests were of medical value. In light of this evidence, plaintiff's unsupported allegations to the contrary do not raise a triable issue of fact sufficient to bar summary judgment. *See Lipton v. Nature Co.,* 71 F.3d 464, 472 (2d Cir.1995) (summary judgment is appropriate even when mental state is at issue, so long as there are sufficient undisputed material facts); *see also Skouras v. United States,* 26 F.3d 13, 14 (2d Cir.1994) (per curiam) (record justified district court's determination at summary judgment stage that defendants acted willfully).

### IV Attorneys' Fees

■■■■■ Both parties appeal aspects of the district court's award of attorneys' fees to the defendants on plaintiff's withdrawn MRI claims. Mikes challenges the court's holding that the MRI claims were frivolous, while defendants object to the decision to limit the award to a default fee of $5000. We review for abuse of discretion both the decision to grant attorneys' fees under § 3730(d)(4) of the False Claims Act and the amount. *See Orchano v. Advanced Recovery, Inc.,* 107 F.3d 94, 99 (2d Cir.1997) (reviewing award of attorneys' fees under 42 U.S.C. § 1988); *Caisse Nationale de Credit Agricole–CNCA v. Valcorp, Inc.,* 28 F.3d 259, 264, 266 (2d Cir. 1994) (holding that abuse of discretion

standard applies to all aspects of a decision to impose sanctions under Fed.R.Civ.P. 11). In our review, we bear in mind that an award of attorneys' fees is well suited to the daily operations of the district court because such a decision may ultimately combine extensive factfinding ability with a large degree of discretion. *Dague v. City of Burlington,* 976 F.2d 801, 803 (2d Cir.1992), *rev'd in part on other grounds,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

### A. Decision to Award Attorneys' Fees

Plaintiff's principal objection derives from the court's decision to preclude all testimony regarding "Mrs. D," defendants' former patient who Mikes alleged was improperly examined by use of an MRI rather than by x-ray. Mikes had contended that defendants—who held a financial interest in an MRI facility—received illicit remuneration through referrals to this facility in violation of § 1320a–7b of the Medicare statute and in turn the False Claims Act. Mikes apparently sought to proffer evidence regarding Mrs. D—mistakenly believing she was a Medicare patient—to prove that Mikes' MRI claims were brought in good faith. But the district court reasoned that Mrs. D's testimony should be disallowed because, as a patient under 65 years of age, she was not Medicare eligible and thus plaintiff could not rely upon Mrs. D's treatment to plead a violation of the Medicare statute.

■■■■■ We have not had occasion to analyze § 3730(d)(4) of the Act, which provides that a district court may award a defendant reasonable attorneys' fees against a *qui tam* relator "if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." Any one of these three con-

ditions is sufficient for an award of attorneys' fees.

 The Act's legislative history suggests that the standard of § 3730(d)(4) is analogous to that used for claims for attorneys' fees brought under 42 U.S.C. § 1988. *See* S.Rep. No. 99–345, at 29, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5294. It is noteworthy that a plaintiff's subjective bad faith is not an element under § 1988. *See Davidson v. Keenan,* 740 F.2d 129, 132–33 (2d Cir.1984). Accordingly, there could be an award for attorneys' fees upon a finding that the MRI claims were *objectively* frivolous, irrespective of plaintiff's *subjective* intent. A claim is frivolous when, viewed objectively, it may be said to have no reasonable chance of success, and present no valid argument to modify present law. *See Caisse Nationale,* 28 F.3d at 264; *see also Maglione v. Briggs,* 748 F.2d 116, 118 (2d Cir.1984) (per curiam) (whether claim is frivolous under § 1988 is an objective inquiry).

 The district court was well justified in finding that plaintiff's MRI claims were objectively vexatious. The consulting agreement between the defendants and the MRI facility in which they held a financial interest provided for a flat consulting fee. *Mikes,* 98 F.Supp.2d at 524. As the defendants' remuneration would not vary with the number of patients they referred, little incentive existed to refer extra patients to the facility. Further, Judge McMahon found no evidence that any Medicare patient inappropriately received an MRI and rejected plaintiff's reliance on the case of Mrs. D, finding such reliance objectively unreasonable. *See id.* at 524–25 ("Mrs. D ... was in fact in her late forties when she was seen at [defendants' office]—a fact that should have been apparent to Dr. Mikes, and that could easily have been ascertained during discovery."). Since plaintiff's allegations were bereft of any objective factual support,

they clearly had no chance of success. Hence, an award of attorneys' fees to defendants was fully justified.

### B. *Amount of District Court's Award*

Defendants challenge the directive from the trial court that they differentiate between those legal services expended on the MRI and the spirometry claims. They further argue that the default attorneys' fee award of $5000 was grossly inadequate in light of the alleged $437,000 spent to defend against Mikes' action.

 It was not an abuse of discretion to limit the award. The Supreme Court has held that where a lawsuit presents "distinctly different claims for relief that are based on different facts and legal theories" the claims should be parsed out and attorneys' fees granted to a plaintiff only on successful claims. *Hensley v. Eckerhart,* 461 U.S. 424, 434–35, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Similarly, a defendant is entitled to attorneys' fees for only those particular claims of a plaintiff deemed to be frivolous. *See Simon De-Bartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 186 F.3d 157, 177–78 (2d Cir. 1999).

Plaintiff's MRI claims are severable from her spirometry claims. They do not have the same factual core and are not premised on related legal theories. *See Quaratino v. Tiffany & Co.,* 166 F.3d 422, 425 (2d Cir.1999). The MRI claims alleged that defendants improperly referred patients to a facility in which they held a financial interest, relying principally upon the Medicare statute's self-remuneration provisions. The spirometry claims, conversely, alleged substandard performance of a medical procedure, relying principally upon § 1320c–5(a) of the Medicare statute. The fact that both claims were brought pursuant to the False Claims Act does not

justify treating them as one for purposes of an award of attorneys' fees.

■ Since defendants were entitled to attorneys' fees only on the MRI claims, they were required to provide those contemporaneous time records that would allow the district court to determine the amount of time spent litigating those claims. These records are required to specify the name of each attorney working on the file, the date the work was done, the hours spent, and the nature of the work performed. *See New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147–48 (2d Cir.1983).

Instead, defendants' documentation calculated their attorneys' fees by taking the total costs of the litigation to date and subtracting those billing entries that specifically referred to spirometry. This figure was then divided in half, reflecting the district court's holding that, of the two types of claims, only the MRI claims were frivolous. As the district court ruled, defendants failed to establish that their attorneys actually expended half of their efforts on the MRI claims. If defendants' attorneys spent the great majority of their time on the spirometry claims, they clearly would be entitled to receive less than half of the legal expense incurred. Consequently, awarding the $5000 default attorneys' fee was not an abuse of the district court's discretion.

## CONCLUSION

We have considered the remainder of the parties' arguments on appeal and find them unpersuasive. Accordingly, the judgment of the district court is affirmed.