The UNITED STATES of America EX REL. Michael D. WATSON, Appellant,

v.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY.

No. 03–1639.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Jan. 16, 2004.

Decided Jan. 16, 2004.

---

Michael J. Salmanson, Law Offices of Michael J. Salmanson, Philadelphia, PA, for Appellant.

William E. McDaniels, Janet C. Fisher, Washington, DC, for Appellee.

Before SLOVITER, RENDELL and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant Michael Watson filed this *qui tam* action against appellees Connecticut General Life Insurance Company ("CGLIC") claiming that CGLIC violated the False Claims Act ("FCA" or "the Act"), 31 U.S.C. §§ 3729–30, by artificially increasing the number of claims CGLIC processed, and as a result, causing the government to compensate CGLIC for the inflated number of claims. Watson also claimed that CGLIC wrongfully terminated Watson's work contract in retaliation

for having reported CGLIC's alleged misconduct. The District Court granted CGLIC's motion for summary judgment. *United States ex rel. Watson v. Conn. Gen. Life Ins. Co.*, No. 98–6698, 2003 WL 303142 (E.D.Pa. Feb. 11, 2003). The court found that Watson had not established a prima facie showing that CGLIC violated the Act and that Watson lacked standing under the Act to challenge his termination. For the reasons set forth below, we will affirm the decision of the District Court.

## I.

Because the parties are familiar with the factual and procedural background of this case, we refer only to those facts that are pertinent to the issues under consideration. The U.S. Department of Health and Human Services' Health Care Financing Administration ("HCFA") administers certain Medicare Part B claims, which include supplemental insurance benefits for *outpatient hospital services and claims for* durable medical equipment sales to Medicare beneficiaries. HCFA contracts with Medicare carriers to process claims from service providers and to approve payment of such claims. CGLIC is one such carrier.

HCFA reimburses CGLIC for the costs CGLIC incurs in processing claims and in conducting reviews and hearings on the claims. Although HCFA and CGLIC approximate an annual budget, CGLIC may apply for additional funds if its costs exceed its budget. Through its business as a processor of durable medical equipment claims ("DMERC"), CGLIC may receive performance-based bonuses or suffer penalties for non-compliance with the terms of its contract. However, CGLIC has not applied, or qualified for a bonus, nor has it ever incurred a penalty.

HCFA reviews CGLIC's performance annually to gauge CGLIC's compliance with the government's Carrier Performance Evaluation ("CPE") program and the Medicare Carriers Manual ("MCM"), which emphasize accuracy and timeliness. CPE is not dispositive as to HCFA's decision to continue working with a carrier.

Appellant Michael Watson contracted with CGLIC in December 1994 to serve as an independent hearing officer to review the denial of general Medicare Part B and DMERC claims challenged by a Medicare provider. CGLIC terminated Watson's DMERC contract on May 24, 1998 and terminated his Part B contract on June 10, 1998.

In December 1998, Watson filed this suit alleging, *inter alia*, that CGLIC violated the FCA by doctoring various performance indicia and terminating his contract in retaliation for reporting CGLIC. Following discovery, Watson moved for partial summary judgment and CGLIC cross-filed for summary judgment. The District Court granted CGLIC's motion in its entirety, finding that Watson failed to make a prima facie case that CGLIC violated the FCA and held that Watson did not have standing to bring a retaliatory termination claim under the FCA because he was an independent contractor, rather than an employee.

## II.

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and exercise plenary review of the District Court's decision granting summary judgment against Watson. *Bauer v. Summit Bancorp*, 325 F.3d 155, 159 (3d Cir.2003). Because Watson concedes that "the statement of facts are as found by the District Court below," Appellant's Br. at 7 n. 2, the facts of the case are not in dispute and we only review the motion for summary judgment.

## III.

### A.

The FCA provides liability for any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). A private party may file a *qui tam* suit on behalf of the government for the recovery of losses caused by the fraudulent claims, and may receive a percentage of the recovery if s/he prevails in the suit. 31 U.S.C. § 3730(b)(1) & (d).

In order to prove a prima facie case under section 3729(a)(1) of the Act, a plaintiff "must prove: (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir.2001) (citations omitted).

A claim is "any request or demand ... for money ... if the United States Government provides any portion of the money ... which is requested or demanded." 31 U.S.C. § 3729(c). The "objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims." *Rainwater v. United States*, 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). However, not all false statements made to the government give rise to claims under the Act. *Hutchins*, 253 F.3d at 183–84. Although an FCA claim does not hinge upon the government suffering monetary damages, liability only attaches if a demand for money has been made on the government, the government "ha[s] been billed for nonexistent or worthless goods, [or] charged exorbitant prices," or the fraud might cause the government to suffer economic loss. *Id.* at 183 (internal quotations and citations omitted). As such, "the proper inquiry under the False Claims Act is whether the defendant made fraudulent claims that caused or would cause economic loss to the United States Treasury." *Id.* at 185. In addition, in order to establish the requisite knowledge, a plaintiff must demonstrate that the alleged offender had actual knowledge that it submitted a false or fraudulent claim for payment, or acted in deliberate ignorance or reckless disregard of the truth or falsity of the claim for payment. 31 U.S.C. § 3729(b).

The crux of Watson's argument is that CGLIC knowingly manipulated and inflated its performance results, thereby causing its claims to the government for cost-reimbursement to be false or fraudulent. Although Watson offered a larger number of theories about CGLIC's misconduct in the District Court, his allegations on appeal fall into two categories. First, Watson contends that CGLIC undertook a policy of encouraging the resubmissions of claims in order to increase the volume of claims it processed, resulting in increased compensation for CGLIC. Second, Watson argues that CGLIC manipulated its performance evaluations and fraudulently certified its compliance with the MCM in order to ensure that CGLIC would receive full compensation, would be eligible for financial bonuses, would avoid contractual penalties, and would encourage the government to renew its contract with CGLIC.

■ Watson argues that CGLIC adopted a policy of resubmitting incomplete claims in order to manipulate its claims-processing volume and costs, and its eventual compensation. Watson argues that the District Court erred in failing to find a sufficient nexus between CGLIC's resubmission policy volume and its eventual compensation. However, even assuming

that the District Court had found such a nexus, Watson has not made a showing that CGLIC acted wrongfully in encouraging the resubmission of incomplete claims, or that its resubmission policy was otherwise fraudulent or in violation of any Medicare regulations. Indeed, MCM § 3005.2 expressly provides that when an incomplete claim is denied, the provider may choose, as appropriate, to 1) resubmit the claim as a new claim or 2) correct the claim and/or seek appellate review. Watson has submitted no evidence that CGLIC encouraged resubmission in inappropriate circumstances; thus, he has failed to demonstrate any underlying fraud. In the alternative, Watson alleges that CGLIC improperly denied incomplete claims that it should have returned as unprocessable. MCM § 3005.1, however, provides that an unprocessable claim may be corrected or resubmitted. Although there are instances in which incomplete claims should be denied, Watson has submitted no evidence of instances in which CGLIC's choice to resubmit such claims constituted wrongdoing. Because Watson has not shown any fraudulent claim or fraudulent resubmission policy underlying CGLIC's claims for payment from the government, Watson's resubmission argument fails.

■ Watson's second argument—that CGLIC manipulated its CPE scores by inflating its claims count and fraudulently certified its compliance with the MCM in order to ensure its full payment without penalties, its contract renewal, and its bonus eligibility—is similarly unavailing. First, Watson provided no evidence that CGLIC's CPE score would have been deficient absent a higher claims count. Indeed, none of the government officials who provided testimony in this case have suggested that CGLIC performed inefficiently or in violation of the efficiency standards set out in the contract. Moreover, Watson has not presented evidence that CGLIC's CPE score or that its certification was singularly determinative of the government's decision to renew its contract or to issue penalties. Nor has Watson provided any evidence that CGLIC's certification of its CPE influenced the government's payment or renewal decisions. Because liability under the FCA only exists if certification of compliance influenced the government's payment decision, *Mikes v. Straus,* 274 F.3d 687, 697 (2d Cir.2001), Watson's failure to marshal evidence of such influence is dispositive. Lastly, as to CGLIC's eligibility for an incentive bonus, we find it telling that CGLIC has never applied for or received such remuneration. Accordingly, the District Court did not err in holding that Watson's FCA claim fails.

**B.**

■ Watson also appeals the District Court's conclusion that he was an independent contractor rather than an employee protected under the FCA's anti-retaliation provisions. The retaliation provision of the FCA, 31 U.S.C. § 3730(h), is limited to employees and affords no protection to independent contractors. Watson's primary argument is that the District Court erroneously believed that its consideration of this issue was limited to the factors enumerated in *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323–24, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), and that the court should have considered additional relevant factors, such as the 20 factors set forth by the IRS. *Employment Status Under § 530,* Rev. Rul. 87–41, 1987–1 C.B. 296, 298–99, 1987 WL 419174.

In *Darden,* the Supreme Court articulated the test for deciding if a party qualifies as an employee or an independent contractor. It listed the following factors as rele-

vant for consideration: (1) the skill required, (2) the source of instrumentalities and tools, (3) the location of the work, (4) the duration of the relationship between the parties, (5) whether the hiring party has the right to assign additional projects to the hired party, (6) the extent of the hired party's discretion over when and how long to work, (7) the method of payment, (8) the hired party's role in hiring and paying assistants, (9) whether the work is part of the regular business of the hiring party, (10) whether the hiring party is in business, (11) the provision of employee benefits, and (12) the tax treatment of the hired party. *Id.* at 323–24.

In applying the *Darden* test, the District Court acknowledged, "None of these factors is determinative; all must be assessed and weighed when considering whether an individual may be characterized as an employee." *Watson,* 2003 WL 303142, at *14. Contrary to Watson's assertions, the District Court also recognized that the *Darden* factors are not exhaustive and it considered additional factors not enumerated in *Darden.* For example, the District Court considered Watson's and CGLIC's intent upon forming a work agreement by considering the plain text of their contracts. The District Court emphasized that the:

> agreements between CGLIC and Watson specifically state that "at all times during the term of the agreement" Watson was "an independent contractor and not an employee" of CGLIC. Def. Tab 14; *see also* Def. Tab 15 ("The relationship between [Watson and CGLIC] is one of agency/independent contractor and not that of employer/employee."). Although not dispositive, the agreement is a strong indicator of Watson's independent contractor status. *Holtzman v. The World Book Co., Inc.,* 174 F.Supp.2d 251, 256 (E.D.Pa.2001).

*Watson,* 2003 WL 303142, at *15. Because the District Court considered the text of their contracts, which is not included among the *Darden* factors, Watson's argument that the District Court misconstrued the *Darden* factors is without merit. Moreover, because Watson has cited no authority that elevates the aforementioned IRS factors above, or as a necessary supplement to, the Supreme Court's *Darden* factors, the IRS test is not controlling.

In addition to the terms of the contracts between Watson and CGLIC and Watson's testimony that he understood that the contracts classified him as an independent contractor, the *Darden* analysis also suggests that Watson was an independent contractor, rather than an employee of CGLIC. Watson was a seasoned hearing officer who required no training from CGLIC and often trained less experienced officers. Watson provided the bulk of his own supplies (audio tapes, data processing system, answering machine, scanner, fax machine), while CGLIC only provided to Watson a tape-recorder, letterhead, reference materials, and limited telephone privileges. Watson largely controlled the location of his work because his contract stipulated that he could "perform this work at any location." App. at 852. Watson took advantage of this liberty, working in California, away from CGLIC headquarters in Tennessee, while in-house hearing officers had to report to headquarters daily. Watson enjoyed the discretion to decline additional projects from CGLIC and CGLIC could not require Watson to perform additional tasks. Watson also enjoyed significant discretion in setting his own hours and vacation. Rather than providing an employee salary, CGLIC paid Watson according to the volume of services he performed, as reflected in a fee schedule based upon his periodic self-submitted invoices.

Consistent with the arrangements of independent contractors, CGLIC's contract with "Michael Watson & Associates" did not restrict Watson's ability to hire and pay assistants. App. at 851–62. Critically, Watson did not receive employee benefits. And finally, Watson filed taxes as a self-employed individual, rather than an employee, under IRS Form–1099, claiming business expense deductions for his home office, advertising, business travel, office equipment depreciation, and office supplies. It is true that three of the twelve *Darden* factors may raise some doubts as to Watson's status (four-year duration of the work and overlap between Watson's work and CGLIC's regular Medicare business), but those few factors are insufficient to create a factual dispute when considered in light of the weight of the other nine factors, which support the District Court's conclusion that Watson was an independent contractor rather than an employee. It follows that Watson does not have standing to bring a retaliatory termination claim under this FCA provision.

## IV.

For the reasons stated above, we will affirm the grant of summary judgment.